**Alice PRESTON, Plaintiff–Appellant,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant–Appellee.**

**No. 87–5222.**

United States Court of Appeals, Sixth Circuit.

Argued Dec. 4, 1987.

Decided June 13, 1988.

Gregory N. Schabell, Florence, Ky., James Roy Williams (argued), Cincinnati, Ohio, for plaintiff-appellant.

Louis DeFalaise, U.S. Atty., Lexington, Ky., John S. Osborn, III, Mary Ann Sloan (argued), Office of Chief Counsel, Dept. of Health and Human Services, Atlanta, Ga., for defendant-appellee.

Before LIVELY and KENNEDY, Circuit Judges, and PECK, Senior Circuit Judge.

PER CURIAM.

This is an appeal from a district court judgment which reversed the decision of the Secretary of Health and Human Services denying Alice Preston's application for social security disability benefits. Although Preston agrees with the district court's determination of disability, she appeals from the part of the judgment which sets the date of onset of her disability as March 26, 1986. She argues that the medical evidence supports a finding that her disability and corresponding right to benefits began May 12, 1983. For the reasons stated herein, we reverse and remand for an award of benefits consistent with this opinion.

Preston applied for social security disability benefits on February 16, 1984, when she was 48 years old. Preston, who has

---

eight years of formal education and a G.E.D., last worked as a telephone operator and filing clerk for thirteen years until May 12, 1983, the alleged date of the onset of her disability. Preston attempted to return to work in July 1983 but stopped after ten days due to pain. The Secretary found that this was an unsuccessful work attempt. Preston has never returned to work and receives a disability pension from her employer. Her disability benefit application alleged that the cause of disability is a bulging disc, arthritis, and chronic allergies. Preston's application was denied initially and upon reconsideration. An administrative hearing was then held on her claim.

At the hearing Preston testified that she has problems with swelling in her face, neck, and back. She maintained that she also has pain in her back and down her left leg, as well as numbness in her arms. Preston stated that she also has had problems with her "nerves" for which she had been treated by Dr. Robert Noelker, a psychologist. Preston testified that she has great difficulty sleeping, can do little housework, and is never completely without pain.

The medical evidence revealed that Preston was hospitalized from May 20, 1983, to June 3, 1983, by Dr. Crabbs, her family physician. After X-rays and CT scans she was diagnosed as having acute lumbar strain and/or sprain; bulging posterior L5–S1 disc; compression fracture of D–12; degenerative cervical disc disease at C5–6 and C6–7; and degenerative arthritis of the spine. She was treated with traction and medication.

In September 1983, Dr. Bridwell, an orthopaedic surgeon, examined Preston due to her continuing complaints of pain. He found no abnormalities. In October 1983 Dr. Bridwell stated that X-rays and CT scans taken looked "quite good." His report states that he was "not quite sure what to make of all this." In December 1983 he again saw her. Although she seemed to be able to walk with no problem, she complained unrelentingly of pain. Dr. Bridwell recommended a myelogram.

Dr. Kramer, a neurologist who had evaluated Preston during her hospital stay, again saw Preston in December 1983. He reported a weakness which suggested an L5 radiculopathy and also recommended a myelogram. The myelogram performed in January 1984 revealed a minimal L4 disc bulging, but no significant abnormality. Dr. Kramer could find no clear-cut anatomical basis for her pain.

Dr. Crabbs reported on February 17, 1984 that he had last seen Preston February 15, 1984. Preston had decreased sensation over the L5 dermatone on the left with decreased left ankle jerk and a continued weakness, findings consistent with a L4 or L5 radiculopathy. Dr. Crabbs stated that Preston was unable to lift more than ten pounds and that he had instructed her not to engage in repeated stooping or bending. He also stated that she had difficulty being on her feet for more than fifteen to twenty minutes, had difficulty sitting in any one position for a significant time, and could not walk more than 100 feet at a time due to pain. Dr. Crabbs believed that Preston continued to be 100% disabled and would be for at least two or three years.

Dr. Noelker, a clinical psychologist, examined Preston on June 9, 1984. He stated that she had multiple psychological problems overlaying or exaggerating her physical symptoms. He completed a residual functional capacity assessment and found that Preston had a moderately severe restriction of her daily activities and a mild limitation in her ability to relate to others. Dr. Noelker further indicated that Preston had poor ability to perform work requiring either frequent or minimal contact with others, and complex or repetitive tasks. Dr. Noelker found that Preston had a fair ability to comprehend and follow instructions, as well as good ability to perform simple tasks. Dr. Noelker diagnosed hysterical conversion neurosis, moderately severe depression, and musculoskeletal psychophysiological reaction. He was of the opinion that Preston's psychological condition rendered her incapable of gainful employment, and that she suffered a functional impairment in the 60 to 70% range.

In August 1984 Dr. Petit conducted a consultative psychiatric examination of Preston for the Social Security Administration. He diagnosed depression secondary to limitations imposed by pain in her back; he did not think the depression was severe.

Dr. Crabbs reported in August 1984 that Preston's condition had not improved since his report in February 1984. In a physical capacities evaluation dated August 30, 1984, Dr. Crabbs again restricted Preston from sitting or standing for more than 15 to 20 minutes at a time, lifting more than ten pounds, bending, squatting, crawling, and climbing. He also restricted her from activities involving unprotected heights, being around moving machinery, and exposure to marked temperature changes, dust, fumes and gases. He moderately restricted her from driving. In a letter dated October 8, 1984, Dr. Crabbs indicated that he was continuing to see Preston every 3 or 4 weeks. He saw Preston September 27, 1984. Preston presented symptoms of muscle spasms and weakness, decreased sensation of the L5, decreased left ankle jerk limited by raising ability and moderately limited range of motion at the waist. Dr. Crabbs' ongoing diagnosis was chronic lumbar strain, bulging disc, radiculopathy, recent compression fracture of D–12, degenerative cervical disc disease, moderate degenerative arthritis of the spine, chronic allergic sinusitis, hysterical conversion and neurosis, moderately severe depression, and musculoskeletal psychophysiological reaction. He prescribed medications for pain and depression. Using American Medical Association guidelines for permanent disability, Dr. Crabbs determined that Preston had a 35% impairment to the body as a whole. He estimated a 60–70% functional impairment that rendered her disabled from the labor market.

In November 1984 Dr. Noelker reported that Preston continued to be disabled due to major psychological problems overlaying her physical maladies. He noted that Preston was experiencing sleep disturbances, vegetative signs of depression and occasional confusion. Dr. Noelker also reported that she had moderately severe short term memory problems, lethargy, and an extremely constricted daily routine.

Based on this evidence, the administrative law judge (ALJ) found that Preston had a severe impairment due to her bulging L4 disc and depression. However, he found her not to be disabled. The ALJ cited Dr. Kramer's inability to find a clear anatomical basis for Preston's pain, and the lack of significant abnormalities in the myelogram. The ALJ also noted that Dr. Bridwell did not report objective findings consistent with Preston's allegations of severe pain and functional limitation. The ALJ found that Dr. Crabbs' findings were inconsistent with those of specialists who had examined Preston; he therefore did not accord Dr. Crabbs' findings great weight. The ALJ determined that the greater weight of the evidence supported a finding that Preston could perform sedentary work, including her past relevant work as a telephone operator and file clerk. Although the ALJ acknowledged that Preston was limited by her depression, he found, referencing Dr. Noelker's assessments of her residual functional capacity, that the limitation would not preclude her from performing her past relevant work.

The Appeals Court declined to review Preston's claim. Preston then filed a complaint in district court for review of the decision. The district court remanded the case for further consideration of Preston's alleged mental impairment under relevant new regulations.

At the supplemental hearing conducted upon remand held on March 28, 1986, Preston presented testimony similar to that at the first hearing.

Dr. Crabbs testified at the hearing that he had recently diagnosed Preston's primary impairment as fibrositis, a condition only recognized in the last several years as a disease involving muscle and musculoskeletal pain. As set forth in the two medical journal articles submitted as exhibits by Dr. Crabbs, fibrositis causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. In stark contrast to the unremitting pain of which fibrositis patients com-

plain, physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion and testing of certain "focal tender points" on the body for acute tenderness which is characteristic in fibrositis patients. The medical literature also indicates that fibrositis patients may also have psychological disorders. The disease commonly strikes between the ages of 35 and 60 and affects women nine times more than men.

Dr. Crabbs testified that Preston has one of the worst cases of fibrositis he has seen. He also asserted that Preston has a disc disorder. He believed that Preston's personality change, which he has observed over the last four or five years of the thirteen years he had been treating her, is attributable to the fibrositis. Dr. Crabbs opined that Preston would have difficulty working in an office environment due to her pain and resulting emotional distress. Dr. Crabbs also stated that fibrositis patients, like Preston, can not sit, stand, or maintain any one position for any length of time.

Dr. Crabbs stated that he had recently sent Preston to a rheumatologist in order to check for conditions that might resemble fibrositis; the tests were negative for a variety of systemic diseases. The rheumatologist, Dr. Carpenter, referred Preston to a pain clinic. Preston testified that treatments there had not worked, and that her pain was worse than ever, although she was continuing treatments at the clinic. Dr. Crabbs also noted that over the last several years, even before he had deduced that fibrositis was the proper diagnosis, he had injected the "trigger points" of pain with cortisone and novocaine to give Preston relief. On cross-examination by the ALJ, Dr. Crabbs testified that Preston's physical capabilities had deteriorated since his August 1984 assessment. He maintained that she could lift ten pounds only on a "good day," which were infrequent.

Dr. McDevitt, a psychiatrist, also testified at the remand hearing as a medical advisor. He testified that Preston's depression was not severe.

The ALJ determined that Preston had a severe impairment due to the fibrositis. He further found that her depression was not severe because it did not impose work related limitations; in this regard he gave the opinions of Drs. McDevitt and Petit greater weight than that of Dr. Noelker, who had not supported some statements by specific findings. The ALJ found that Preston was capable of her prior work as a secretary, and was therefore not disabled. The Appeals Council adopted the ALJ's decision.

Preston then filed an action in district court for judicial review of the Secretary's final determination denying her benefits. The Magistrate agreed with the Secretary's findings with regard to Preston's depression, but recommended a reversal and remand for an award of benefits with regard to the Secretary's finding of no disability due to fibrositis. The Magistrate asserted that the ALJ's finding of no disability conflicted with Dr. Crabbs' uncontradicted opinion that Preston's condition and associated pain had worsened to the point that she could no longer perform even the activities listed in Dr. Crabbs' August 1984 evaluation. The Magistrate recommended that an award of benefits commence from March 26, 1986.[1] The district court adopted the Magistrate's recommendation. Preston timely appealed.

There is no doubt that Preston suffers from disability due to her fibrositis. The sole issue is the date of onset of disability, i.e. whether there is substantial evidence to support the Secretary's finding that Preston was not disabled prior to March 26, 1986.[2] Substantial evidence is relevant evi-

[1.] The Magistrate fixed March 26, 1986, as the date for onset of disability due to his misimpression that Dr. Crabbs last examined Preston on that date. Dr. Crabbs' testimony reflects that he last examined Preston on March 24, 1986.

[2.] Preston also challenges the Secretary's finding, affirmed by the district court, that her mental impairment is not severe. We affirm the district court on this issue for the reasons stated

dence, when the record is taken as a whole, that a reasonable mind might accept as adequate to support a conclusion. *Duncan v. Secretary of Health & Human Services,* 801 F.2d 847, 851–52 (6th Cir.1986).

Our task in reviewing this issue is complicated by the very nature of fibrositis. Unlike most diseases that can be confirmed or diagnosed by objective medical tests, fibrositis can only be diagnosed by elimination of other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue. Despite the difficulties thus presented by this peculiar case, we find that substantial evidence does not support the Secretary's finding that Preston could do her past relevant work prior to March 26, 1986.

Dr. Crabbs' uncontradicted testimony at the supplemental hearing was credited by the Magistrate and was the basis for the award of benefits commencing March 26, 1986. Importantly, in that testimony Dr. Crabbs related back many of his 1986 findings to his earlier consistent findings in February and August 1984. On cross-examination by the ALJ at the supplemental hearing, Dr. Crabbs maintained that most of his findings in his August 1984 assessment of Preston's physical capabilities remained the same. These were: that Preston could not pull or push with her arms; could not use her right leg for repetitive motions; could not repeatedly bend, squat, crawl, climb or reach; and that she was restricted from unprotected heights, machinery, and marked environmental changes. These restrictions were in turn consistent with his February 1984 opinion in relevant part that she could not engage in repeated stooping or bending, could not lift more than ten pounds, and should not push or pull. Dr. Crabbs also testified at the supplemental hearing that Preston's ability to engage in certain other activities had deteriorated since his 1984 assessments. In February and in August 1984 he had stated that Preston could only sit 15 to 20 minutes at a time, stand 15 to 20 minutes at a time, walk 100 to 150 feet at most, and lift up to 10 pounds. Crabbs

in the Magistrate's Report and Recommenda-

specifically commented at the supplemental hearing that Preston could lift up to 10 pounds only on good days, which were at that time extremely rare, and that her ability to sit, stand, and walk had also worsened.

The limitations Dr. Crabbs placed on Preston's physical activity as early as February 1984 were highly similar to those he set in March 1986 and precluded sedentary work under Social Security guidelines and our holding in *Wages v. Secretary of Health & Human Services,* 755 F.2d 495, 497–499 (6th Cir.1985). It is clear from Dr. Crabbs' earliest restrictions that Preston could not maintain any one position (e.g., sitting or standing) for any significant length of time; she has to be able to move about as needed. As stated in *Wages,* "[t]he concept of sedentary work contemplates substantial sitting as well as some standing and walking. Alternating between sitting and standing, however, may not be within the definition of sedentary work." *Id.* at 498. *Accord, Howse v. Heckler,* 782 F.2d 626, 628 (6th Cir.1986). *See also* Ruling SSR 83–10, 83–12. Although Drs. Bridwell and Kramer could find no definitive reason for Preston's pain and symptoms, neither expressly contradicted or discredited Dr. Crabbs' opinion of disability due to the above factors. Because Dr. Crabbs' opinion based on his March 1986 examination of Preston which was credited by the Magistrate is consistent with and largely restates his February 1984 opinion, it was inconsistent not to accord Dr. Crabbs' February 1984 opinion weight for purposes of determining the date of onset of disability.

Although the opinion of a treating physician, when supported by medical evidence, is entitled to substantial weight in determining disability, *Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir.1986), the Secretary argues that such medical evidence is lacking to support Dr. Crabbs' opinion. The Secretary also cites the fairly normal clinical and test results obtained by Drs. Kramer and Bridwell which do not correlate with a dis-

tion.

abling disease. However, the CT scans, X-rays, and minor physical abnormalities, noted by these doctors and cited by the Secretary as substantial evidence of no disability before March 26, 1986, are not highly relevant in diagnosing fibrositis or its severity. As noted in the medical journal articles in the record, fibrositis patients manifest normal muscle strength and neurological reactions and have a full range of motion. Thus, the standard clinical tests and observations conducted by Drs. Bridwell and Kramer to detect neurological and orthopaedic disease were of little aid or relevance in the diagnosis of Preston's disabling fibrositis, except as a means of excluding certain neurologic or orthopaedic causes of her pain. In other words, the findings of Drs. Bridwell and Kramer are not substantial evidence that Preston's fibrositis is not disabling.

On the other hand, over a period of time Dr. Crabbs has done all that can be medically done to diagnose Preston's fibrositis and to support his opinion of disability. He referred Preston to a neurologist, orthopaedist, rheumatologist, and a psychologist for evaluation. He also referred Preston to physical therapy and a pain clinic for treatment. He observed that Preston's complaints of pain, stiffness and fatigue were classic symptoms of fibrositis. Moreover, even before Dr. Crabbs was able to pinpoint fibrositis as the proper diagnosis, he was injecting cortisone or novocaine for relief into the parts of the body that he later learned were "focal tender points" characteristic of fibrositis patients. Given the circumstances of this case and the nature of this disease, Dr. Crabbs' systematic elimination of other diagnoses, identification of focal tender points, and observation of other classic symptoms of fibrositis satisfied the standard set forth in *Duncan, supra*, which requires objective medical evidence to confirm the severity of the pain arising from the condition or that the objectively established medical condition is of such severity that it can be reasonably expected to produce disabling pain. 801 F.2d at 853.

Dr. Crabbs' opinion of disability since February 1984 has been consistent, uncon-tradicted, and is supported by medical evidence, while substantial evidence to support an onset date of March 26, 1986 is lacking. Although Preston has argued that she is entitled to benefits commencing May 12, 1983, the date she last worked, the record reflects that Dr. Crabbs did not state that she was afflicted by a long-term disability until February 15, 1984, when he stated for the first time that she would be disabled for at least two to three years.

Accordingly, we reverse the judgment of the district court as to the onset date of disability and remand this case with instructions to award benefits commencing February 15, 1984.