960 F.2d 143
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Francesca CARBONE, Plaintiff, Appellant,
v.
Louis W. SULLIVAN, Secretary of Health and Human Services,
Defendant, Appellee.
 No. 91-1964.
 United States Court of Appeals,
First Circuit.
 April 14, 1992
 
 Gretchen Bath on brief for appellant.
 Lincoln C. Almond, United States Attorney, Michael P. Iannotti, Assistant United States Attorney, and Nancy B. Salafia, Assistant Regional Counsel, Department of Health and Human Services, on brief for appellee.
 Before Selya, Circuit Judge, Campbell, Senior Circuit Judge, and Cyr, Circuit Judge.
 Per Curiam.
 
 
 1
 Francesca Carbone (claimant) appeals from a district court judgment affirming a decision by the Secretary of Health and Human Services to deny her application for disability benefits under the Supplemental Security Income (SSI) program. Claimant was born in Italy in 1941 and attended school there through the fifth or sixth grade. She came to this country in 1970 and worked as a press machine operator from 1974 to 1976. On October 21, 1988, she filed the instant application for benefits, alleging that she has been disabled since March 1976 due to arthritis, high blood pressure, sciatic pain, dizzy spells and nerves. Following a hearing at which claimant, her daughter and a vocational expert (VE) testified, the Administrative Law Judge (ALJ) denied her claim at step four of the sequential analysis-finding that claimant had failed to establish an inability to perform her past work. The Appeals Council considered but declined claimant's request for review, and the district court, at the recommendation of a magistrate-judge, subsequently affirmed. Claimant now appeals.
 
 I.
 
 2
 Claimant advances a barrage of objections to the ALJ's opinion. The thrust of her argument is that the ALJ misread or ignored key medical findings, with the result that the assessments of various physicians were improperly discredited, with the further result that her complaints of pain were improperly discounted. An evaluation of these claims requires a brief summary of the medical evidence. Such evidence comes from four sources: Dr. Chun Kak Lee, claimant's treating physician since 1980; Dr. Karen Holmes, a consulting internist; several treating physicians at the Roger Williams Hospital rheumatology clinic; and Dr. Dominic Coppolino, a consulting psychiatrist. In line with the focus of claimant's argument, our attention will be directed principally to the evidence concerning her complaints of pain. And because disability benefits under the SSI program are available only from the date of a claimant's application, see, e.g., 20 C.F.R. § 416.202; Commonwealth of Pennsylvania v. United States, 752 F.2d 795, 799 (3d Cir. 1984), we shall concentrate on the period beginning in October 1988.
 
 
 3
 Claimant visited Dr. Lee approximately 80 times between July 1980 and November 1989. The notes from these visits are cursory, containing little more than a notation of claimant's complaints, her weight and blood pressure, and the medications prescribed. The complaints were varied and for the most part minor; with few exceptions, physical examination was reported as being within normal limits. Claimant was prescribed pain medication continuously throughout this period-at first Norgesic Forte, and then Motrin. Yet on only eight occasions (one in 1988, three in 1989) did Dr. Lee record complaints of pain other than headaches, and only rarely did these concern the same part of the body.[1]
 
 
 4
 Dr. Holmes examined claimant on January 6, 1989, several months after the filing of her application. After recording claimant's complaints,[2] she made the following findings. Her knees revealed some changes of osteoarthritis, but no effusion. There was a full range of motion in all joints, without synovial bogginess or redness. Straight leg raises resulted in pain in the right knee and right back with an elevation of 25 degrees. Range of motion was diminished in the neck in all directions, and also in the back; claimant could bend forward only 20 degrees before the onset of severe pain. Neurological findings were normal, with full motor strength in all extremities, and an intact sensory exam. Gait was slow, favoring the right leg, and claimant was unable to perform heel or toe walking, tandem gait walking, or squatting movements. Dr. Holmes' assessment was that claimant's arthritis imposed "quite severe" restrictions; even when claimant was not having an attack of her sciatic problem, she remained "very limited in her ability to maneuver ... and be active."[3]
 
 
 5
 In an August 1989 report, Dr. Lee stated that claimant's "hypertension, tachycardia, anxiety, headache, and arthritis ha[ve] been fairly controlled by medications. [Claimant] is obese and main problem is dizziness [with] headache." With respect to her arthritis, he added that claimant complained occasionally of back pain, which was "fairly responding" to medications. In October, Dr. Lee referred claimant to the rheumatology clinic at Roger Williams Hospital for treatment of her arthritis. And on December 3, 1989, he submitted a report indicating that her condition was "not any better," and that her arthritis had been "extremely painful" during a November 25 visit. He also provided on that date an RFC assessment indicating that claimant could lift or carry only five pounds occasionally, could sit, stand, or walk for only one hour in an eight-hour workday, was unable to use her feet for repetitive movements such as pushing of leg controls, and was unable to climb. In an accompanying commentary, he added that claimant was suffering from rheumatoid arthritis.
 
 
 6
 Claimant was first seen at the hospital clinic on October 18, 1989. She voiced complaints similar to those recorded by Dr. Holmes ten months earlier.[4] During the examination, she was in no acute distress at rest but grimaced when rising from a chair. There was limited range of motion in the neck secondary to pain complaints. Examination of the extremities proved difficult due to pain complaints; range of motion could not be tested. The joints revealed no acute inflammation, effusions, or erythema (redness or swelling). Gait was consistent with right hip and low back pain, and generalized tenderness to palpation existed over the entire body. The examining physician reached an initial assessment of generalized musculoskeletal pain, stated that fibrositis[5] and depression must be considered, expressed doubt that rheumatoid arthritis or other connective tissue diseases were involved, and ordered x-rays of the knees, hips and spine. These x-rays, performed that same day, revealed the following: mild degenerative changes in both knees with effusions but no soft tissue abnormality; mild degenerative changes in the right hip; and disc space narrowing L4-5, along with mild scoliosis (curvature of the spine).
 
 
 7
 The record contains reports from four additional visits made by claimant to the hospital clinic. On November 3, 1989, she complained of continuing pain, more on the right side than the left. The hands revealed moderate synovitis with erythema and tenderness, and the wrists were tender and painful. Lateral rotation of the neck was restricted, and the left shoulder revealed point tenderness. The knees showed no erythema or effusion. An assessment of fibrositis was reached. On December 12, claimant presented with complaints of continued diffuse pains with increased pain in the neck and left shoulder, pain and numbness in the first three fingers of the right hand, and increased difficulty in sleeping. Examination proved very difficult due to pain. There were no effusions, warmth, or erythema in any joint. Shoulder movement was restricted. The hands revealed heberdens nodes (an abnormal enlargement of the bone or cartilage in the joints), and trigger points appeared in the neck, shoulder, elbow and thigh. The assessment was: (1) osteoarthritis involving the hands, the knees and probably the neck; (2) diffuse musculoskeletal pains, with numerous reproducible trigger points on exam, consistent with fibrositis; and (3) sciatica symptoms, with no evidence of spinal cord compression, but with narrowed disc space compressing on nerve roots.
 
 
 8
 At a January 12, 1990 hospital visit, claimant stated that her main problem lately had been increased blood pressure and headaches; her aches and pain were described as "up and down." Physical exam revealed no "inflammatory findings." Finally, on April 13, 1990, claimant complained of pain in the right knee, calf, left ankle and hips, along with swollen joints and headaches. Multiple reproducible trigger points were detected, her hands showed heberdens nodes, and shoulder movement was restricted. The assessment was osteoarthritis and fibrositis. Medications (Clinoril and Elavil) were continued, and claimant was directed to return in four months.
 
 
 9
 Dr. Coppolino performed a psychiatric examination on November 28, 1989. In his report, he first noted that claimant was limping, favoring her left ankle, and that her principal complaint was pain. Without meaning to suggest that she was free of clinical problems, he stated that there was "no doubt an exaggeration on her part" with respect to "whatever physical conditions she has," and that restrictions in movement were likely "psychogenic." As to her mental condition, Dr. Coppolino found it significant that the onset of claimant's varied complaints apparently coincided with her divorce in 1975. Speech was slow and hesitant, but Dr. Coppolino attributed this to deliberate hesitation rather than psychomotor retardation. Claimant was oriented in the three spheres, with intact memory. There was no evidence of hallucinations, delusions, or psychosis. And in a test measuring retention of consecutive digits, Dr. Coppolino found that claimant deliberately gave wrong answers. His assessment was chronic dysthymia with anxiety, moderate. He indicated that conversion features were mildly to moderately present, but also noted evidence of exaggeration and volitional elements.
 
 
 10
 In an accompanying RFC evaluation, Dr. Coppolino rated claimant as moderately impaired in relating to other people, performing daily activities, responding appropriately to customary work pressures, and performing complex tasks. She was deemed mildly to moderately impaired in her ability to carry out instructions, and only mildly impaired in seven other categories. Dr. Coppolino stated that her pain complaints were "probably not" consistent with clinical findings, while adding that the actual restrictions imposed by her pain depended "on the nature and extent of physical ailments." He also noted that his judgments were "exclusively based on psychiatric impressions" obtained during the examination.
 
 II.
 
 11
 The ALJ viewed much of this evidence with skepticism. Dr. Lee's notes, he determined, did not support a diagnosis of arthritis (or any other painful condition); only intermittent complaints of pain and stiffness had been recorded, no x-ray evidence had been obtained "which is essential for a diagnosis of arthritis as it clearly will show up on x-ray," and no arthritis medication had been prescribed. He also observed that, while Dr. Lee's December 3, 1989 report had described claimant's arthritis during the November 25 visit as "extremely painful," the notes from that visit made no reference to pain complaints. The ALJ likewise rejected Dr. Holmes' assessment that claimant's arthritis was "severely" limiting. Again, no x-rays had been taken, the reported limitations in movement involved areas of the body claimant had not complained about, and the medical findings "reflect[ed] only [claimant's] subjective complaints, none of which were borne out on examination." Of the five hospital reports, the ALJ only saw the first two (the hearing having been held on December 7, 1989). These, he determined, reflected some minor findings but "little evidence of severe arthritis or joint disease." He found "no sound medical exam evidence for the basis of any back, hip, or neck pain," and regarded the limitations reported by the examining physicians to be "more an exaggeration on her part than caused by any medical condition." Finally, while the ALJ otherwise fully credited the psychiatric report, he disagreed with Dr. Coppolino's finding that claimant was moderately limited in her ability to perform daily activities and relate to other people. Claimant had stated to Dr. Coppolino that she attributed her mental difficulties to her physical ailments. The ALJ, having found no serious physical impairment, therefore determined that she was only mildly limited in her ability to perform the above-mentioned activities.
 
 
 12
 Based on his evaluation of the medical evidence, the ALJ determined that claimant suffered from hypertension, mild degenerative joint disease in the knees, and chronic dysthymia with mild to moderate anxiety. He discounted the "complaints of severe disabling pain throughout her body, dizziness and nervousness and anxiety," on the grounds that they were "not credible to the degree alleged and ... not supported by substantial medical evidence."[6] And he found that claimant remained capable of lifting up to twenty pounds at a time (ten frequently), and thus could perform the full range of light work. As the VE had classified claimant's prior work (as usually performed) as light and unskilled,[7] the ALJ therefore denied her application at step four.
 
 
 13
 In seeking review by the Appeals Council, claimant emphasized, inter alia, the diagnoses of fibrositis and osteoarthritis contained in the more recent hospital reports. The Appeals Council, after "carefully consider[ing]" such evidence, held that it "establishes neither a new impairment nor a greater degree of severity regarding a previously diagnosed disorder"; rather, it "essentially repeats information that was available to the [ALJ] in the hearing record." After further determining that the ALJ had justifiably discredited claimant's complaints of pain, the Appeals Council declined review.
 
 III.
 
 14
 Of the various challenges lodged by claimant to the ALJ's decision, many prove to be well-founded; indeed, the government takes exception with few of them. For example, the ALJ's assumption that x-rays are a prerequisite to the diagnosis of arthritis finds no support in the record, and would appear a dubious one. See, e.g., Merck Manual 1260 (15th ed. 1987) ("Diagnosis [of osteoarthritis] is usually based on symptoms and signs, as described above, or by x-ray in asymptomatic patients"). His statement that the pain medications prescribed by Dr. Lee were inappropriate for treating arthritis likewise lacks support. His finding that there was "no medical basis" for any complaints of back or hip pain would appear inconsistent with the x-ray results. In a similar vein, while it is proper to discount the evaluation of a physician who has "relied excessively on claimant's subjective symptoms, rather than on objective medical findings," Rodriguez Pagan v. Secretary of HHS, 819 F.2d 1, 3 (1st Cir. 1987) (per curiam), cert. denied, 484 U.S. 1012 (1988), the ALJ appears to have been overly disposed to reject those clinical findings not confirmed by laboratory results on the ground of being "subjective." See, e.g., Gatson v. Bowen, 838 F.2d 442, 447 (10th Cir. 1988) ("objective medical evidence of disabling pain need not consist of concrete physiological data alone but can consist of a medical doctor's clinical assessment"); accord Miranda v. Secretary of HHS, 514 F.2d 996, 999 (1st Cir. 1975). And claimant is correct in asserting that the ALJ ignored the assessment of fibrositis reached in the November 3, 1989 hospital report.[8]
 
 
 15
 Whether these deficiencies in the ALJ's decision warrant a remand presents a closer question. Claimant's various allegations essentially reduce to the question of whether her complaints of pain were properly evaluated. Any claimant alleging disability due to pain has the threshold burden of establishing a clinically determinable medical impairment that can reasonably be expected to produce the pain alleged. See, e.g., 20 C.F.R. § 404.1529; Avery v. Secretary of HHS, 797 F.2d 19, 21 (1st Cir 1986). Upon such a showing, the Secretary is not free to discount pain complaints simply because the alleged severity thereof is not corroborated by objective medical findings. See, e.g., Da Rosa v. Secretary of HHS, 803 F.2d 24, 25-26 (1st Cir. 1986) (per curiam). Rather, those complaints must be considered along with all other relevant evidence, and "detailed descriptions of [claimant's] daily activities" must be obtained. Avery, 797 F.2d at 23; accord, e.g., Social Security Ruling (SSR) 88-13. And "[w]hen medical signs and laboratory findings do not substantiate any physical impairment capable of producing the alleged pain (and a favorable determination cannot be made on the basis of the total record), the possibility of a mental impairment as the basis for the pain should be investigated." Id. (quoted, in earlier format, in Avery, 797 F.2d at 27).
 
 
 16
 Fitting the ALJ's decision into this analytical framework is somewhat problematic. Claimant suggests that her pain complaints were dismissed because the ALJ categorically (and improperly) rejected the diagnosis of arthritis. Yet, while portions of the ALJ's decision support such an inference, he did reach a finding of mild degenerative joint disease in the knees-which is another name for osteoarthritis. See, e.g., Mosby Medical Encyclopedia 215 (1985). At the same time, the government agrees that the ALJ dismissed the pain allegations at the threshold stage: "Avery requires a threshold showing of a clinically determinable medical impairment that could reasonably be expected to produce the pain.... The absence of such a showing constitutes the basis of the ALJ's rejection of plaintiff's subjective complaints." Brief at 11. The Appeals Council read the ALJ's decision differently, finding that the pain complaints had been discredited only after a full Avery inquiry. It stated:
 
 
 17
 The Appeals Council agrees with the [ALJ] that the objective medical findings do not disclose a degree of pathology consistent with your subjective complaints. Under these circumstances, the Avery [case] requires the [ALJ] to consider other evidence relating to pain. In this case the Appeals Council is satisfied that the [ALJ's] consideration of the suggested factors is substantially in compliance with the Avery decision.
 
 
 18
 The magistrate-judge construed the ALJ's decision in similar fashion.
 
 
 19
 Had the ALJ dismissed the pain allegations at the threshold level (as the government contends), we would be hard-pressed to find support therefor. For claimant's fibrositis (if not her osteoarthritis) clearly constitutes an impairment reasonably capable of producing the pain alleged. Yet we agree with the Appeals Council and district court that the ALJ, despite some intimations to the contrary in his decision, did accord full consideration to the subjective pain complaints. To be sure, in explaining the basis for his decision to discount such complaints, the ALJ emphasized the perceived weaknesses in the medical evidence and concluded that "no significantly limiting physical impairment" had been shown. But his consideration of the matter did not end there. He questioned claimant at length during the hearing as to the nature of her daily activities, and described her responses in some detail in his decision. And he expressly relied on Dr. Coppolino's findings of exaggerated symptoms and false answers in determining that claimant's subjective complaints were not fully credible. None of this further inquiry would have been necessary had he dismissed such complaints at the threshold level.
 
 
 20
 We remain troubled, however, by the fact that the ALJ overlooked the diagnosis of fibrositis. Such an impairment, while not invariably disabling of course, see, e.g., Tsarelka v. Secretary of HHS, 842 F.2d 529 (1st Cir. 1988) (per curiam), is a potentially serious one. See note 5 supra. And several factors here suggest that reconsideration of claimant's complaints of pain in light of such diagnosis would be appropriate. As mentioned, the ALJ evaluated such complaints primarily with reference to the arthritis claim. And in doing so, he emphasized that the physical examinations yielded, for the most part, seemingly unremarkable "objective" results (a term he defined on occasion too narrowly). Yet this is apparently not unusual in fibrositis sufferers: "In stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results-a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." Preston v. Secretary of HHS, 854 F.2d 815, 817-18 (6th Cir. 1988) (per curiam) (paraphrasing "medical journal articles"); accord Tsarelka, 842 F.2d at 532 (quoting medical testimony). We think that, without an awareness of claimant's fibrositis condition and an appreciation of its unusual symptoms, the ALJ's Avery analysis was necessarily skewed.[9]
 
 
 21
 To a lesser extent, we are troubled by the ALJ's failure to investigate the possibility of a psychological basis for the pain alleged, as called for by Avery and SSR 88-13. The Preston court informs us that "fibrositis patients may also have psychological disorders." 854 F.2d at 818. To be sure, Dr. Coppolino found that claimant was purposefully exaggerating her symptoms. Yet he also reported mild to moderate evidence of conversion factors, which the ALJ mentioned in his factual summary but never addressed. More to the point, Dr. Coppolino never reviewed claimant's medical records or ascertained the nature of her physical ailments with any precision; he presumably was unaware of the fibrositis diagnosis. Given the unusual manner in which the symptoms associated with that ailment are manifested, his ignorance in this regard may well have affected his findings. We therefore question whether the ALJ satisfied his burden under Avery simply by relying on the Coppolino report.[10]
 
 
 22
 Taken together, we think these factors warrant a remand for reconsideration of claimant's pain complaints. Admittedly, there are countervailing indications. The record contains considerable evidence militating against a finding of intense, disabling pain.[11] An ALJ's credibility determination is entitled to "considerable deference." Dupuis v. Secretary of HHS, 869 F.2d 622, 623 (1st Cir. 1989). Some of the ALJ's skepticism concerning the medical evidence was warranted.[12] And claimant bears the burden at step four "of making some reasonable threshold showing that she cannot return to her former employment because of her alleged disability." Santiago v. Secretary of HHS, 944 F.2d 1, 4 (1st Cir. 1991) (per curiam). Nonetheless, disability determination proceedings are nonadversarial in nature, see, e.g., Currier v. Secretary of HHS, 612 F.2d 594, 598 (1st Cir. 1980), and the Secretary-while under no duty to go to "inordinate lengths to develop a claimant's case," Thompson v. Califano, 556 F.2d 616, 618 (1st Cir. 1977)-must "make an investigation that is not wholly inadequate under the circumstances," Miranda, 514 F.2d at 998; accord Santiago, 944 F.2d at 5-6 (at step four, "an ALJ may not simply rely upon 'the failure of the claimant to demonstrate [that] the physical and mental demands of her past relevant work' can no longer be met, but, 'once alerted by the record to the presence of an issue,' must develop the record further") (citation and emphasis omitted). Here, given the ALJ's failure to explore the physical and mental implications of claimant's fibrositis, and given the other shortcomings in his decision, we do not believe that an adequate investigation was conducted. We are unable to conclude, in other words, that "a reasonable mind, reviewing the record as a whole, could accept it as adequate to support [the ALJ's] conclusion." Lizotte v. Secretary of HHS, 654 F.2d 127, 128 (1st Cir. 1981).[13] We emphasize that, in remanding, we do not mean to indicate that a disability finding is necessarily warranted-only that additional medical evaluation relevant to the mentioned issues, and a fresh determination in light thereof, are called for.
 
 
 23
 The judgment of the district court is vacated and the case is remanded to the district court with instructions to remand to the Secretary for further proceedings consistent with this opinion.
 
 
 
 [1]
 Dr. Lee's notes record the following complaints of pain:
 8/9/80 sciatic nerve
10/23/80 pain in right and left knees
9/20/86 pain in back
10/31/87 general aching pain
3/5/88 pain in knees
4/29/89 pain in elbows and ankles
8/5/89 pain in left leg
9/5/89 pain "everywhere"
 His notes also reflect intermittent complaints of swelling and "puffiness."
 
 
 [2]
 Claimant stated that her arthritis was a long-standing condition which affected her feet, knees, hands, elbows and neck. It caused much stiffness extending throughout the day, and also led to swelling, particularly in the knees, without redness. It sharply restricted her mobility, allowing her to walk for only ten minutes before needing to rest. Claimant also stated that she had suffered from sciatic pain for the last 15 to 20 years. She continued to have seven to eight flare-ups per year, which lasted for several weeks and made all movement difficult
 
 
 [3]
 On the basis of Dr. Holmes' report, an agency physician submitted a residual functional capacity (RFC) assessment in May 1989. It indicated that claimant could lift 20 pounds (10 pounds frequently). She could stand or walk only for four hours in an eight-hour workday, with pace and distance markedly limited. Her ability to perform repetitive leg movements, such as pushing foot controls, was moderately limited. She could climb only rarely, for only a few steps. And she could stoop, kneel, or crouch only occasionally
 In a redetermination rationale that same month, the agency relied on this RFC to find that claimant was unable to return to her past work as a foot press operator. It further held, however, that she remained capable of performing other work not involving prolonged standing or the use of foot controls.
 
 
 [4]
 The following complaints were noted. Claimant suffered from generalized pain in all of her joints for the past 6-10 years. Redness, swelling, and warmth in the joints occurred intermittently, especially in her ankles, hands, right knee and left elbow. The problem had grown progressively worse over the past year, although medication afforded some relief. Because of the pain, claimant experienced difficulties in sleeping, climbing stairs, and walking for more than short periods, and had lost 33 pounds in the last year. She also had a 15-year history of sciatic pain in the lower right back and right leg, which flared up intermittently and required localized injections and extended bed rest
 
 
 [5]
 Fibrositis is the "swelling of fiberlike connective tissue," the symptoms of which include "pain and stiffness of the neck, shoulder, and body." Mosby Medical Encyclopedia 291 (1985). The Sixth Circuit has recently described this ailment as follows:
 [F]ibrositis [is] a condition only recognized in the last several years.... [It] causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. In stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results-a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion and testing of certain "focal tender points" on the body for acute tenderness which is characteristic in fibrositis patients.... [F]ibrositis patients may also have psychological disorders. The disease commonly strikes between the ages of 35 and 60 and affects women nine times more than men.
 Preston v. Secretary of HHS, 854 F.2d 815, 817-18 (6th Cir. 1988) (per curiam) (quoted in Lisa v. Secretary of HHS, 940 F.2d 40, 44-45 (2d Cir. 1991)); see also Tsarelka v. Secretary of HHS, 842 F.2d 529, 532-33 (1st Cir. 1988) (per curiam).
 
 
 [6]
 At the hearing, both claimant and her daughter had described the nature of her pain, in terms consistent with the complaints recited above. They also had explained how it restricted her activities. Claimant, it was said, often needs her daughter's assistance to get out of bed and get dressed. She spends most of the day sitting or lying on a sofa. She sometimes dusts, and performs a little cooking. Once a week, she might go shopping with her daughter for thirty minutes, spending most of the time sitting on a bench or leaning against the shopping cart. She attends church once a month. Otherwise, she stays at home, in part because of difficulty in climbing the stairs to her third-floor apartment. Claimant also stated she could walk for only ten minutes at a stretch, could sit for thirty minutes before needing to stand, and experienced difficulty sleeping
 
 
 [7]
 This was the extent of the VE's testimony; he provided no further description of claimant's past work nor any hypothetical opinion as to her continued ability to perform it
 
 
 [8]
 At the same time, claimant's assertion that "the Secretary ... wholly ignored the more recent Roger Williams hospital records, which contain a new diagnosis (fibrositis)," Brief at 15, is disingenuous. First, as mentioned, fibrositis was diagnosed earlier, on November 3, 1989. Second, claimant did not forward the updated records until June 1990, over two months after the ALJ's decision. They were sent to the Appeals Council; there is no indication the ALJ ever saw them. And third, as mentioned, the Appeals Council fully considered these records in reaching its decision to deny review
 On a separate matter, claimant is likewise mistaken in arguing that Dr. Lee's notes "repeatedly" document "on-going complaints of pain and stiffness." Brief at 14. The record, as mentioned earlier, is to the contrary. See note 1 supra.
 
 
 [9]
 We disagree, in other words, with the Appeals Council's conclusion that the fibrositis diagnosis "establishes neither a new impairment nor a greater degree of severity regarding a previously diagnosed disorder," but rather "essentially repeats information that was available" to the ALJ. That diagnosis was "new" in the sense that the ALJ failed to consider it. And it potentially involved more severe pain, and manifested itself differently, than the ailments recognized by the ALJ
 Contrary to the Appeals Council's further conclusion, we do not see how the ALJ can be said to have conducted a meaningful Avery inquiry while remaining ignorant of claimant's fibrositis. It is noteworthy in this regard that the "specific inquiries" called for by Avery were here directed only to claimant and her daughter. Their replies provided little, if any, support for the ALJ's conclusion. Compare, e.g., Gordils v. Secretary of HHS, 921 F.2d 327, 330 (1st Cir. 1990) (per curiam) (pain allegations appropriately discredited in part because daily activities found to be "practically intact").
 
 
 [10]
 Although not raised by claimant on appeal, we note two difficulties with the ALJ's review of the psychiatric RFC evaluation. As mentioned, Dr. Coppolino found that claimant was moderately restricted in her ability to relate to other people and to perform daily activities. The ALJ rejected these findings on the ground that claimant had attributed her sadness to her physical ailments, and those ailments in the ALJ's view were insubstantial; he therefore found only mild restrictions in this regard. Yet contrary to the ALJ's premise, Dr. Coppolino determined that claimant's mental condition was related primarily to her divorce. And to the extent the ALJ was disagreeing with the RFC based on his own review of the evidence, we think he "overstep[ped] the bounds of a lay person's competence and render[ed] a medical judgment." Gordils v. Secretary of HHS, 921 F.2d 327, 329 (1st Cir. 1990); accord Berrios Lopez v. Secretary of HHS, 951 F.2d 427, 430 (1st Cir. 1991) (per curiam) ("the ALJ is not qualified to assess claimant's residual functional capacity based on the bare medical record")
 Second, Dr. Coppolino found that claimant's ability to respond to customary work pressures was moderately restricted. The ALJ disregarded this finding on the ground that it was not applicable to her past work as a press machine operator. Although he did not elaborate, we read this to mean that he regarded her past job as a low-stress one; the Appeals Council, in fact, stated as much. To be sure, a claimant bears the initial burden of establishing that her former employment was stressful when disability is alleged on that basis. See, e.g., Santiago v. Secretary of HHS, 944 F.2d 1, 6 (1st Cir. 1991) (per curiam); May v. Bowen, 663 F. Supp. 388, 394 (D. Me. 1987). Yet we do not think the ALJ was free to assume, absent vocational evidence, that claimant's past work did not involve "customary" work pressures, and to reject Dr. Coppolino's RFC assessment based on that assumption.
 
 
 [11]
 For example, claimant exhibited few of the objective indicia of severe pain, such as muscle spasm, muscle atrophy, or sensory or motor loss. Dr. Lee's notes, as mentioned, recorded only intermittent complaints of pain. In August 1989, he reported that all of claimant's problems were "fairly controlled by medications," that her back pain was "fairly responding" to Motrin and Tylenol, and that her "main problem" was dizziness with headaches. At the hospital on November 3, 1989, claimant complained of pain more on the right side than the left; to Dr. Coppolino some three weeks later, she was favoring her left ankle. The hospital reported on January 12, 1990 that her "main problem lately" was increased blood pressure and headaches, and that her aches and pains were up and down. Follow-up visits were thereafter scheduled only every four months. And claimant testified at the hearing that the medication reduced (although did not eliminate) her pain
 
 
 [12]
 For example, Dr. Lee's diagnosis of rheumatoid arthritis appears to have been faulty
 
 
 [13]
 On remand, the ALJ should obtain "an expert's RFC evaluation"-as to claimant's physical as well as mental restrictions-"unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person." Santiago, 944 F.2d at 7; see also Gordils v. Secretary of HHS, 921 F.2d 327, 329 (1st Cir. 1990) (per curiam) (Secretary entitled to render "common-sense judgments about functional capacity based on medical findings"). The present record contains only two physical RFC's prepared by physicians-those of Dr. Lee and an agency doctor, see note 3 supra. Both indicated that claimant was unable to perform her past work