NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0746n.06

No. 12-4227

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Aug 12, 2013

DEBORAH S. HUNT, Clerk

SONJA STANKOSKI,                              )
                                             )
        Plaintiff-Appellant,                  )
                                             )
v.                                           )     ON APPEAL FROM THE UNITED
                                             )     STATES DISTRICT COURT FOR
MICHAEL J. ASTRUE,                           )     THE SOUTHERN DISTRICT OF
COMMISSIONER OF SOCIAL SECURITY,             )     OHIO
                                             )
        Defendant-Appellee.                   )
                                                   OPINION

Before: McKEAGUE and DONALD, Circuit Judges; LAWSON, District Judge.[*]

        **Bernice B. Donald, Circuit Judge.**   On April 30, 2007, Sonja Stankoski applied for

disability insurance benefits.  Her application was denied by the Commissioner of Social Security.

The denial was upheld after a hearing before an administrative law judge.  The Commissioner's

decision was affirmed by the district court.  Stankoski timely appeals.  For the reasons set forth

herein, we **AFFIRM.**

**I.**

        In 2007, Sonja Stankoski sought Social Security disability insurance benefits, alleging that

she could not work due to a host of mental and physical impairments.  Although she attempted to

_____

        [*] The Honorable David M. Lawson, United States District Judge for the Eastern District of
Michigan, sitting by designation.

do part-time work as an interpreter in 2008 and 2009, she had not engaged in substantial gainful activity since November 3, 2006, the alleged onset date of her disability. Stankoski testified that she received private disability benefits until May 2009. Stankoski suffers from major depressive disorder, single episode; osteoarthritis of the spine; ischemic cardiac disease; fibromyalgia; obesity; and hypothyroidism.

**1. Mental Impairments**

In April 2007, Stankoski was diagnosed with major depressive disorder, severe without psychotic features. In August 2007, Stankoski attended a psychological consultative mental status examination where Mark Hammerly, Ph.D., diagnosed her with moderate single episode major depression. Dr. Hammerly noted that Stankoski was mildly deficient in social relationships and performed minimal household and community activities. Dr. Hammerly also noted that Stankoski drove herself to appointments and attempted to seek employment within the last year. Dr. Hammerly rated Stankoski's mental abilities as moderately impaired in relating to others; not impaired in her ability to understand, remember, and follow instructions; not impaired in her ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks; and moderately impaired in her ability to endure the stress and pressures associated with day-to-day work activity. Stankoski sought mental health treatment until May 2009 when her husband changed insurance. In July 2009, Bruce Hennessy, M.D., Stankoski's treating gastroenterologist, recommended that Stankoski continue to see a counselor for her ongoing depression. Dr. Hennessy opined that Stankoski seemed depressed and that Stankoski's depression was creating her physical symptoms.

Dr. Hennessy explained to Stankoski that medical therapy was unsuccessful in treating her physical ailments, but psychotherapy could be beneficial in getting to the root of the problem. Stankoski received psychotropic medication, but she has not received the recommended psychotherapy.

## 2. Physical Impairments

### A. Back Impairments

In September 2007, an x-ray of Stankoski's lumbar spine suggested degenerative disc disease at vertebrae L4-L5 with interspace narrowing, sclerosis, spurring, and vacuum disk formation. In October 2007, a lumbar magnetic resonance imaging (MRI) scan showed L4-5 desiccation and bulge with moderate spinal canal stenosis, along with L3-4 disc desiccation and bulge with mild biforaminal stenosis and mild central canal stenosis. Stankoski also had an MRI of the cervical spine, which showed C3-C4 spondylotic protrusion resulting in mild to moderate stenosis; effacement of the thecal sac absent evidence of spinal cord compression; C4-C5 disc desiccation with broad-based bulging disc that effaces the thecal sac absent evidence of any spinal cord compression and mild left-sided foraminal stenosis; and C5-C6 disc height narrowing and disc desiccation with spondylotic protrusion effacing the thecal sac absent evidence of cord compression with other mild degenerative changes. In November 2007, Stankoski had another MRI of the thoracic spine, which demonstrated minimal, non-compressive lower thoracic spondylosis with no evidence of compressive discopathy in the thoracic spine. Throughout this time, Stankoski complained of pain and numbness in her back and legs.

In October 2009, Stankoski had a computed tomography scan of the lumbar spine and the thoracic spine. The scan of the lumbar spine confirmed the previously discussed degenerative changes along with moderate to severe degenerative changes at L5-S1. The scan of the thoracic spine indicated mild degenerative changes. In November 2009, another MRI revealed desiccation of the L3-L4 through L5-S1 intervertebral discs, along with central spinal canal stenosis at L4-L5 related to discogenic spondylotic changes with bilateral foraminal encroachment. Another MRI showed multilevel diffuse disc bulging with no spinal cord compression.

On November 30, 2009, Stankoski's treating physician, William Kemp, M.D., F.A.C.S., noted in his clinical assessment to Albert Salomon, D.O., another treating physician, that Stankoski had some thoracolumbar pain secondary to degenerative changes without evidence of spinal cord or nerve root compression. He also indicated that the thoracic area did not likely require a surgical procedure; however, local injection therapy might be an option. Dr. Kemp opined that Stankoski was having only mild problems and her stenosis was moderate. He went on to explain that he and Stankoski discussed surgical treatment of her spinal stenosis which would include decompression, fixation and fusion at L4-L5, but he mentioned that Stankoski did not feel that the level of her difficulties was sufficient to warrant surgical intervention. Instead, she wanted to try epidural steroid injections and pain management treatment. During a follow-up appointment in December 2009, Stankoski expressed that she had normal strength in the bilateral upper and lower extremities.

### B. Heart Impairments

Stankowski was diagnosed with coronary artery disease and was treated in July 2008 with cardiac catheterization and insertion of a stent. During a routine follow-up on October 28, 2009, her physician indicated that Stankoski was doing well without chest pain, shortness of breath, paroxysmal nocturnal dyspnea (PND), orthopnea, or peripheral edema. Her physical condition was unremarkable at that time. On March 6, 2009, a cardiac catheterization revealed another lesion, which was treated with a drug-eluting stent. The treating physician opined that the new stent had achieved excellent results and the original stent looked great. On March 27, 2009, Stankoski followed-up with the treating physician and complained that she felt poorly and continued to suffer from chest pressure, burning, and shortness of breath. The treating physician noted that Stankoski looked great and that her physical condition was unremarkable. He altered her medication and asked her to join cardiac rehabilitation. In June 2009, another cardiovascular catheterization showed two-vessel artery disease with 65 percent stenosis of the left anterior descending artery and 65 percent stenosis of the circumflex. During a follow-up visit in September 2009, Stankoski reported mild improvement in her fatigue and shortness of breath, improvement in her mood, and that she felt better overall.

### C. Fibromyalgia

On August 18, 2007, Dr. Herbert A. Grodner diagnosed Stankoski with degenerative joint disease and fibromyalgia, "which has caused her to have 'extreme pain' in her back, neck, hands,

shoulders, and knees." On February 2, 2010, Dr. Albert M. Salomon examined Stankoski during a routine check-up and indicated that Stankoski was suffering from fibromyalgia.

### D. Obesity

On December 4, 2007, Dr. Albert M. Salomon indicated that Stankoski was obese, based on three weight measurements taken during periodic intervals in 2007. On June 15, 2009, while discharging Stankoski from the hospital after she underwent a heart angioplasty, Dr. Ernest L. Mazzaferri, Jr. also diagnosed Stankoski as being obese.

### E. Hypothyroidism

On August 18, 2007, Dr. Herbert A. Grodner diagnosed Stankoski with hypothyroidism. On June 10, 2008, Dr. Kenneth H. Vitellas examined Stankoski and determined that her thyroid gland was "unremarkable."

## 3. Proceedings

On April 30, 2007, Sonja Stankoski filed an application for disability insurance benefits. Her claim was denied by the Commissioner of Social of Security. Thereafter, Stankoski filed a written request for a hearing, which was held by an administrative law judge (ALJ) via video conference. Stankoski appeared in Columbus, Ohio, and the ALJ presided over the hearing from Houston, Texas.

With regard to her mental impairments, Stankoski testified that she could take care of her personal needs and only had mild restrictions with her daily living activities. She also testified that while she does not get out of the house often, she visits her family. Stankoski further explained that she has trouble concentrating and completing tasks in a timely manner.

During the proceedings, Daniel W. Hamill, Ph.D., a psychological expert, confirmed Stankoski's major depression, single episode. Dr. Hamill, however, did not believe that Stankoski's mental impairment rose to the level of a disability under the Social Security standards. He based his conclusion, in part, on Stankoski's moderate score on her global assessment of function, which is inconsistent with "marked" impairment.[1]

During the proceedings, Melissa Neiman M.D., a medical expert, opined that none of Stankoski's physical impairments rose to the level of any listing for presumptive disability. She testified that Stankoski could perform light level work activity that excluded crawling, crouching, kneeling, heights, ropes, scaffolds, ladders, exposure to heights, or use of dangerous machinery.

After consideration of the evidence, the ALJ concluded that Stankoski was not disabled within the meaning of the Social Security Act. Stankoski appealed the ALJ's decision denying her application for social security disability insurance benefits. The district court adopted the magistrate

---

[1]The term "marked" is a standard for measuring the degree of limitation. Marked means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, so long as the degree of limitation is such as to interfere seriously with the ability to function independently, appropriately, effectively, and on a sustained basis. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

judge's report and recommendation affirming the Commissioner of Social Security's decision. Stankoski now appeals.

**II.**

On appeal of a denial of benefits, we conduct a *de novo* review of the district court's legal conclusion that the ALJ's decision was supported by substantial evidence. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646 (6th Cir. 2011); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). "Substantial evidence is more than a scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 803 (6th Cir. 2008) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). We, however, will not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Rather, we "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Vance*, 260 F. App'x at 803 (quoting *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005)). A review of the record demonstrates that the ALJ's upholding of the Commissioner's decision was adequately supported by substantial evidence.

Stankoski argues that the ALJ made several errors in disposing of the case at step five of the sequential evaluation process prescribed by 20 C.F.R. § 404.1520, contending that the ALJ: (1) made

errors of fact and law in evaluating the medical and vocational evidence; (2) erred in evaluating Stankoski's nervous and mental impairments; (3) erred regarding Stankoski's subjective complaints and the credibility finding; and (4) found that Stankoski could perform jobs that exceed her capabilities. We must decide whether, under 42 U.S.C. § 405(g), substantial evidence supports the ALJ's decision.

Stankoski argues that the ALJ said that he relied on "objective medical evidence" in dealing with Stankoski's complaints relating to fibromyalgia, which does not have objective findings except the familiar trigger points. She also argues that the ALJ should not have relied on Dr. Neiman, a neurosurgeon, when fibromyalgia falls to the specialty of rheumatology. And Dr. Grodner opined that she would have difficulty doing most types of physical activity. It bears noting, as we have on earlier occasions, that in many cases where a claimant bases an allegation of disability on a diagnosis of fibromyalgia, difficulty arises over the lack of objective findings, because that ailment is difficult to correlate with objectively observable, physical manifestations. *See, e.g., Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 817-18 (6th Cir. 1988) (observing that, "[a]s set forth in the two medical journal articles . . . fibrositis causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. . . . [I]t is a process of diagnosis by exclusion and testing of certain 'focal tender points' on the body for acute tenderness which is characteristic in fibrositis patients"); *Clark v. Aetna Life Ins. Co.*, 395 F. Supp. 2d 589, 609 (W.D. Mich. 2005) (citing *Gaffney v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 733, 736 (E.D. Mich. 2003)); *see also Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). But a diagnosis of fibromyalgia

does not equate to a finding of disability or an entitlement to benefits. *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008).

The ALJ took into account the objective medical evidence concerning Stankoski's limitations when determining her residual functional capacity to perform work. Residual functional capacity is an "assessment of [the claimant's] remaining capacity for work," once her limitations have been considered. 20 C.F.R. § 416.945(a). It is meant "to describe the claimant's residual abilities or what the claimant can do, not what maladies a claimant suffers from — though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities." *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 240 (6th Cir. 2002).

Stankoski argues that Dr. Neiman's assessment that Stankoski only had mild degenerative changes in her lower back was factually incorrect. Stankoski also quibbles with the order in which the ALJ heard testimony. Both of these arguments are unavailing. While there is objective medical evidence that demonstrates Stankoski suffered from back impairments, there is also ample evidence to support the ALJ's conclusion that Stankoski's back impairments did not result in limitations beyond her capacity to perform a limited range of light work. For example, Stankoski underwent numerous imaging scans, but none of the imaging results demonstrated that Stankoski's back impairments were debilitating. Moreover, Stankoski admitted that she did not feel that her back pain warranted a surgical procedure. As such, she opted for less invasive epidural injections and pain management therapy and the record suggests that Stankoski responded well to these treatments.

Stankoski also argues that her mental impairments are more limiting than the ALJ's conclusions show. Stankoski claims that they affect her on a daily basis, evidenced by crying spells and low energy. Yet there is no objective medical evidence to support these complaints. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("There is no question that subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record.") An ALJ is not required to accept a claimant's subjective complaints and "may properly consider the credibility of a claimant" when making a determination of disability. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Stankoski essentially asks this court to delve into a credibility determination, and we simply will not decide questions of credibility. *See Halter*, 307 F.3d at 379. There is ample evidence in the record to support the Commissioner's finding that Stankoski's mental impairments did not compromise her ability to perform a range of semi-skilled work outlined by the ALJ. For example, Stankoski achieved a moderate global function assessment, she was able to drive herself to her appointments, and she benefitted from mental health counseling but chose to stop going to counseling only after her husband's insurance coverage changed.

Stankoski argues that the ALJ gave greater weight to the findings of Drs. Neiman and Hammil compared to Stankoski's treating physicians and that the ALJ failed to specify the amount of weight given. "Generally, the opinions of treating physicians are given substantial, if not controlling, deference." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). However, "treating physicians' opinions are only given such deference when supported by objective

medical evidence." *Id.* (citing *Jones*, 336 F.3d at 477). None of Stankoski's treating physicians opined that any of Stankoski's ailments were debilitating. In fact, her treating physicians' opinions are in alignment with the ALJ's decision. And even if they were not, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Vance*, 260 F. App'x at 804 (quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).

Stankoski argues that her job skills are not transferable. This argument, however, was not raised before the district court and therefore is forfeited. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513 (6th Cir. 2010). Stankoski also argues that the ALJ erred by finding that she could perform semi-skilled jobs while at the same time finding that she was limited to unskilled work. This argument is without merit because the ALJ's decision does not limit Stankoski to unskilled work. For example, the residual functional capacity assessment did not limit Stankoski to unskilled work and none of the medical opinions of record limited Stankoski to unskilled work.

**III.**

There is ample evidence in the record to support the Commissioner's finding that none of Stankoski's impairments were disabling in the Social Security context. *See Vance*, 260 F. App'x at 803. For this reason, we **AFFIRM**.