21 F.3d 419
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Timothy B. MITCHELL, Plaintiff, Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee.
 No. 93-1612
 United States Court of Appeals,
First Circuit.
 March 25, 1994
 
 Appeal from the United States District Court for the District of Massachusetts [Hon. Frank H. Freedman, Senior U.S. District Judge ]
 Timothy B. Mitchell on brief pro se.
 A. John Pappalardo, United States Attorney, Karen L. Goodwin, Assistant United States Attorney, and Robert M. Peckrill, Assistant Regional Counsel, Department of Health & Human Service, on brief for appellee.
 D.Mass.
 AFFIRMED
 Before Breyer, Chief Judge, Selya and Cyr, Circuit Judges.
 Per Curiam.
 
 
 1
 Pro se claimant Timothy Mitchell appeals a district court judgment that affirmed the denial of his claim for Supplemental Security Income (SSI) benefits. A former competitive bicyclist, claimant applied for SSI in June 1989, when he was 24 years old. He claimed that he was disabled due to chronic pain resulting from musculoskeletal inflammation affecting most of his joints, particularly his wrists and hands. Claimant alleged that his pain was aggravated by repetitive motions and hot weather. In 1987, claimant secured a bachelors degree in cultural anthropology from the University of Massachusetts. He held various part-time jobs during and after college, including those of a dishwasher, psychiatric counsellor, prep cook, psychiatric aide, stock person, bus person, and salesperson. His last position was as a telephone fundraiser, which required frequent repetitive use of the hands in dialing and writing.
 
 
 2
 After claimant's application was denied upon initial review and reconsideration, claimant represented himself at a hearing before an administrative law judge (ALJ). The ALJ reviewed the conflicting medical evidence and determined that claimant had no exertional limitations and only a "marginally severe somatoform disorder."[1] The ALJ concluded that while the latter condition moderately impaired claimant's ability to maintain persistence and pace, thereby preventing him from performing his past work as a telephone fundraiser, it did not prevent the claimant from performing his other past jobs. Thus, the ALJ denied claimant's application at step four of the sequential evaluation process. See Goodermote v. Secretary of Health and Human Services, 690 F. 2d 5, 6-7 (1st Cir. 1982). The district court affirmed this conclusion and claimant has taken a timely appeal. Having thoroughly reviewed the record, we also affirm for the reasons discussed below.
 
 I.
 
 3
 We first review the medical and other evidence which is essential to a complete understanding of claimant's allegations. The record discloses that claimant bicycled 16,000 kilometers (or 10,000 miles) in various races during the summer of 1983. He began having health problems in 1984, and consulted Dr. Robert Leach, an orthopedic surgeon, for pain behind his left knee. Claimant reported that he had recently had surgery on his left thigh for compartment syndrome and that he had previously consulted numerous doctors and chiropractors for various other pains.[2] He had taken Indocin (an anti-inflammatory agent) and Butazolidan (a rheumatoid arthritis treatment) without relief and had also undergone a myelogram. Apart from an area of tenderness around claimant's left knee semitendinosis tendon, physical exam was completely normal and Dr. Leach "was impressed with how loose [claimant] was." Dr. Leach made no diagnosis or recommendations. He stated that he did "not have any ideas as to where to go from here" in view of the extensive studies claimant had already undergone.
 
 
 4
 There are no medical records from 1985, during which claimant was apparently enrolled in college and worked at various times as a prep cook and adolescent psychiatric counsellor. In November 1986 claimant consulted Dr. Jonathan Kurtis, another orthopedic surgeon, for bilateral arm pain associated with his job as a dishwasher. Dr. Kurtis reported that his evaluation was negative for a severe problem and that "it was thought that he had an occupational tendonitis of his wrist."[3] Claimant graduated from college in May 1987. While claimant's vocational report does not identify it, the medical records suggest that at some point following his graduation claimant either volunteered or worked in an administrative position with the Institute for International Development and Cooperation.
 
 
 5
 In September 1987 claimant consulted Dr. Lawrence Schiffman, a rheumatologist, complaining of bilateral wrist pain while he was working as a dishwasher and a carpenter. He reported a history of tendonitis in his shoulders, knees, and elbows (epicondylitis) while also complaining of groin pain and lower back pain, although the latter was not chronic. Claimant denied morning stiffness and sleep problems. Physical examination disclosed that claimant had a full range of musculoskeletal motion, although he experienced tenderness at the base of the thumb and Achilles tendon. Dr. Schiffman recorded an impression of tendonitis and prescribed Feldene, an arthritis medication. Follow-up lab tests for rheumatoid arthritis were negative.[4] Claimant apparently travelled to Africa at some point in 1988 and returned to Dr. Schiffman in April with complaints of pain at the base of the thumbs and groin. He again denied morning stiffness; no swelling was present. Apart from the areas of tenderness noted, physical exam was essentially normal. Dr. Schiffman's again recorded an impression of tendonitis and continued to prescribe medications. Follow-up lab tests for rheumatoid arthritis, Lyme disease, and HIV were negative.
 
 
 6
 At some point during 1988 claimant also travelled to Denmark. There he sought further evaluation of his pain. Claimant returned to Dr. Schiffman in July 1988 complaining of bilateral wrist, groin, and thigh pain. He was then taking Ibuprofen. Claimant reported that he was able to swim but that this resulted in increased pain. Physical exam disclosed no swelling nor other positive findings. Dr. Schiffman advised claimant to stop swimming and prescribed ultrasound therapy for his wrists. Between July and September 1988 claimant underwent weekly ultrasound treatments at the Easthampton Physical Therapy Services. He reported experiencing some improvement from the pain in his wrists, although he did not attribute it to the treatments.[5] At the conclusion of the treatments Dr. Schiffman referred claimant to Dr. Allison Ryan, a specialist in neurology and psychiatry, stating that he had "not been able to establish a diagnosis" although he felt claimant's symptoms were "most likely due to an overuse syndrome, worsened by deconditioning."[6]
 
 
 7
 In November 1988 claimant applied for services at the Massachusetts Rehabilitation Commission (MRC). Shortly thereafter he began working part-time as a telephone fundraiser for the Progressive Group, Inc. On January 4, 1989, claimant returned to Dr. Schiffman, continuing to complain of "tendonitis" in his wrists and knees. Physical exam again disclosed no swelling and a full range of motion. Claimant denied morning stiffness and reportedly was walking regularly (10-20 minutes). On the following day, claimant was examined by Dr. Charles Brummer, a family physician who evaluated claimant for the MRC. Dr. Brummer recounted claimant's extensive history of complaints and unsuccessful treatments for pain in his legs, hips, shoulders, and elbows. Despite treatment with multiple medications, claimant reported that he experienced no relief. Physical exam was normal, with a full range of musculoskeletal motion and no swelling, heat, or redness, although claimant subjectively complained of pain with motion and palpation. Dr. Brummer concluded that claimant suffers from a soft tissue inflammatory disease such as chronic tendonitis or, "more probably a fibromyositis or fibromyalgia syndrome" which often respond poorly to medications.[7] He suggested that claimant was not capable of work and advised him to avoid significant lifting, climbing, or repetitive motions. Based on Dr. Brummer's evaluation, in January 1989 the MRC determined that claimant was eligible for vocational rehabilitation services as a severely handicapped individual.[8] Claimant also began weekly acupuncture treatments with Jonathan Klate, Ph.D., a licensed acupuncturist. Dr. Klate continued to treat claimant throughout the time his claim was pending and submitted a report to the SSA which opined that claimant was significantly disabled.
 
 
 8
 Claimant resigned from his position as a telephone fundraiser around June 29, 1989, claiming that he was physically unable to meet the job's requirements due to wrist and hand pain aggravated by warmer weather. He applied for SSI benefits on the same day. Claimant was subsequently examined by two internists on behalf of the SSA, Dr. Enrico Petrillo and Dr. Dwight Robinson. Dr. Petrillo reported a normal physical exam and concluded that claimant had musculoskeletal symptoms of burning and pain in the muscles and tendons bilaterally. He did not assess claimant's residual functional capacity (RFC). Dr. Robinson found that claimant exhibited 20 degree flexion contractures of both elbows, but that claimant's joint exam was otherwise unremarkable. In particular he noted that there was no swelling or tenderness and no muscle atrophy. Dr. Robinson indicated that claimant might have a variant of fibromyalgia and that his functional ability was clearly limited by his symptoms, although he did not assess claimant's RFC. He advised claimant to pursue gradual muscle strengthening exercises and possibly to try an antidepressant.[9]
 
 
 9
 Based on the aforementioned medical evidence, the SSA secured an assessment of claimant's exertional RFC from Dr. Harvey Wald, a non-examining consultant. Dr. Wald concluded that claimant was limited to light work. Consequently, the SSA denied claimant's initial application and claimant filed a request for reconsideration. Claimant consulted another rheumatologist, Dr. Robert Gray, on December 7, 1989. Physical exam again disclosed that both elbows showed a 20-30 degree loss of full extension, but flexion was full. There was no synovial (joint) swelling, no fibrositic trigger points, and no evidence of muscle atrophy or weakness. Dr. Gray concluded that claimant suffered from arthralgias (joint pain) and myalgias (muscle pain) of undetermined etiology and that his symptoms were atypical of fibrositis syndrome. On December 13, 1989, claimant was examined by Dr. Jerome Siegel, another consulting internist. Physical exam disclosed that claimant appeared well, had no history of sleep disturbance, and again exhibited a full range of motion with no synovial thickening. No trigger point tenderness areas were palpated. Shoulder x-rays and lab tests were normal. Dr. Siegel made a differential diagnosis of pain disorder involving the joints with questionable fibromyalgia, somatization disorder, and chronic pain disorder. Neither Dr. Gray nor Dr. Siegel assessed claimant's RFC.
 
 
 10
 Finally, on January 24, 1990, claimant was evaluated for the SSA by Dr. Sanford Bloomberg, a psychiatrist. Claimant reported that he suffered from a "painful condition" that affected essentially all of his major joints although his complaints were "completely subjective." Although claimant reported that his activities had become extremely constricted as a result, he was then taking graduate courses and applying to graduate school at the University of Massachusetts. He was also the editor of his church newsletter and participated in a young adult group. Despite being able to shop, cook, and participate in the aforementioned activities, claimant professed that he was in constant pain. He denied trouble sleeping. Dr. Bloomberg stated that, "[t]he only diagnosis I would make would be a somatoform pain disorder, with no related organic pathology, which so far, can be specifically identified to document the diagnosis that some physicians have made for him, fibrocytis or fibromyalgia." Dr. Bloomberg noted that where one local expert (presumably referring to Dr. Gray) had concluded that claimant did not have fibrositis, claimant's complaints of pain were grossly in excess of what one would expect if he had any pathology.[10] While Dr. Bloomberg did not assess claimant's RFC, the SSA secured a mental RFC evaluation from Dr. Joseph Lichtman, a psychologist. Dr. Lichtman concluded that claimant suffered from a somatization disorder which would often result in deficiencies of persistence, concentration, and pace resulting in a failure to complete tasks in a timely manner. However, he found that claimant's activities of daily living and ability to maintain social functioning were only slightly limited, and that claimant never suffered from episodes of deterioration or decompensation in work or work-like settings.
 
 
 11
 The ALJ credited Dr. Lichtman's functional findings in concluding that claimant was not disabled. He specifically found that claimant does not have a medically determinable physical impairment that could reasonably be expected to result in the degree of pain and functional loss that claimant has alleged. The ALJ then evaluated claimant's subjective pain complaints in accordance with Avery v. Secretary of Health and Human Services, 797 F.2d 19, (1st Cir. 1986), and concluded that claimant's subjective allegations were not credible in view of claimant's activities as a graduate student and church member, the fact that there was no physical basis for claimant's pain, and the fact that claimant took no medications at the time of the hearing.[11] The ALJ found that claimant's residual functional capacity was not significantly restricted exertionally and that his somatoform disorder only prevented him from performing his past job as a telephone fundraiser. After the hearing claimant submitted additional letters to the Appeals Council where he recounted that he had begun a course of treatment with amitriptyline, an anti-depressant used to treat fibromyalgia. The Appeals Council declined review, thus rendering the ALJ's decision final.
 
 II.
 
 12
 We are bound to affirm the Secretary if his decision is supported by substantial evidence on the record as a whole. See, e.g., Rodriguez v. Secretary of Health and Human Services, 647 F.2d 218, 222 (1st Cir. 1981). Any claimant seeking disability benefits bears the initial burden of proving that his condition prevents him from performing his former type of work, not just that he cannot return to a particular job. See Gray v. Heckler, 760 F.2d 369, 372 (1st Cir. 1985). And, as the Secretary's regulations provide that even part time work may constitute substantial gainful activity, the fact that all of claimant's past positions were part time jobs does not require a finding of disability. See Davis v. Secretary of Health and Human Services, 915 F.2d 186, 189 (6th Cir. 1990); 20 C.F.R. Sec. 416.972(a)(work may be substantial even if it is done on a part time-basis).
 
 
 13
 On appeal, claimant argues that the evidence establishes that he meets the Somatoform Disorder Listing (Sec. 12.07) because he has repeatedly suffered from episodes of deterioration or decompensation at work, as evidenced by the fact that he has withdrawn from several of his past jobs due to wrist tendonitis. Claimant also contends that the ALJ should have given more weight to the reports of his health care providers
 
 
 14
 (e.g., Drs. Schiffman, Brummer, and Klate), particularly where the doctors who assessed claimant's residual functional capacity did not even examine him. Claimant emphasizes that he is unable to use his upper extremities and, since most jobs entail this requirement, he is unable to perform his past jobs and any other substantial gainful activity. Each of these arguments must fail given our limited standard of review and the conflicting evidence in the record.
 
 
 15
 First, while it is true that the ALJ found that claimant satisfied three of the paragraph A criteria required to meet the Somatoform Disorder Listing, see n. 1, supra, the record amply supports the ALJ's conclusion that claimant does not suffer from the degree of functional loss required to meet the paragraph B criteria of Sec. 12.07. Thus, even if claimant resigned from his job as a telephone fundraiser due to increased pain, this alone does not establish that he experienced the repeated episodes of deterioration in the work place required to satisfy Sec. 12.07. Moreover, claimant's testimony and contact with the SSA supports the ALJ's conclusion that his activities of daily living and social functioning were not significantly impaired. Claimant resides with seven people, is able to do some cooking, cleaning, writing, and driving, in addition to participating in church activities and attending graduate school while his SSI claim was pending. Even with the restrictions claimant has identified, these activities do not suggest a level of impairment consistent with total disability. Thus, the ALJ did not err in concluding that claimant failed to prove that he satisfies the Somatoform Disorder Listing.
 
 
 16
 With respect to claimant's second contention, it is well-established in this circuit that a treating physician's opinion may be rejected by the Secretary, who may accord greater weight to his own experts. See, e.g., Keating v. Secretary of Health and Human Services, 848 F.2d 271, 272 (1st Cir. 1988)(per curiam); Barrientos v. Secretary of Health and Human Services, 820 F.2d 1, 2-3 (1st Cir. 1987)(per curiam); Sitar v. Schweiker, 671 F.2d 19, 21 (1st Cir. 1982)(per curiam). In concluding that claimant suffered only from a somatoform disorder and not from a physical impairment (e.g. fibromyalgia), the ALJ credited the opinions of Drs. Siegel and Bloomberg, both of whom suggested the diagnosis of somatoform disorder, and the opinion of claimant's own rheumatologist, Dr. Gray, who stated that claimant's symptoms were inconsistent with fibrositis, particularly noting the absence of trigger point tenderness and complaints of poor sleep. There was no error in the ALJ's decision not to place more weight on the opinions of claimant's other health care providers. The ALJ correctly observed that the disability opinion expressed by claimant's acupuncturist was not entitled to the weight that might be accorded a physician since the regulations do not recognize acupuncturists as acceptable medical sources. See 20 C.F.R. Sec. 416.972(a)(acceptable medical sources include licensed physicians, osteopaths, psychologists, optometrists, and record custodians). To be sure, the record arguably supported a finding that claimant does suffer from a physical impairment-fibromyalgia that does limit him exertionally. But since conflicts in the evidence are for the Secretary to resolve, see, e.g., Burgos Lopez v. Secretary of Health and Human Services, 747 F.2d 37, 40 (1st Cir. 1984), we cannot second guess the ALJ's decision to credit the evidence which undermined this diagnosis.
 
 
 17
 The ALJ rejected claimant's contention that he is prevented from working because he cannot use his upper extremities, finding that his complaints of disabling pain and functional loss were not credible. An ALJ's credibility determinations are owed "considerable deference." Dupuis v. Secretary of Health and Human Services, 869 F.2d 622, 623 (1st Cir. 1989). Nevertheless, we question the ALJ's conclusion that claimant suffers from no exertional limitations. In the first place, this finding is contradicted by Dr. Wald, the SSA's consultant who found that claimant was exertionally limited to light work. And given the significant number of physicians who reported that claimant suffered at least some loss of function due to his subjective symptoms, we question whether the ALJ as a layman was qualified to conclude that claimant suffered no exertional limitations even if he found the cause of claimant's condition to be a mental impairment (i.e, a somatoform disorder) as opposed to a physical impairment. See Walston v. Gardner, 381 F.2d 580, 585 (6th Cir. 1967)(pain may be disabling even if partly caused by an emotional problem). As a general rule, an ALJ is not qualified to assess residual functional capacity on the basis of bare medical findings. See, e.g., Berrios Lopez v. Secretary of Health and Human Services, 951 F.2d 427, 430-31 (1st Cir. 1991). However, the record supports the ALJ's implicit conclusion that claimant retained the capacity for light work. In particular, we note that the duties of claimant's past salesperson job fall within this exertional category, and that "the type of work involved in a sales clerk job would not necessarily involve continual use of both arms and hands for long periods of time...." Gray v. Heckler, 760 F.2d at 374. The same can be said of claimant's past job as a psychiatric aide. Accordingly, where substantial evidence supports the ALJ's conclusion that claimant can do at least some of his past jobs, the judgment of the district court is affirmed.
 
 
 
 [1]
 Somatoform disorders are characterized by,"[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." See 20 C.F.R. Part 404, Subpart P, App. I, Sec. 12.07. This listing may be satisfied if, inter alia, the medical evidence documents either: (1) "[a]history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or" (2)[p]ersistent nonorganic disturbance of ... [s]ensation (e.g., diminished or heightened)" or (3)[u]nrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury; ...." Id., Sec. 12.07(A)
 
 
 [2]
 Compartment syndrome is "a condition caused by inward pressure of an artery reducing blood supply. It can result in a permanent contraction of the hand or foot." See Mosby Medical Encyclopedia, p. 182 (1985)
 
 
 [3]
 Claimant returned to Dr. Kurtis in January 1987 for left heel pain cause by his cross-country ski boots. In reporting these findings to the Social Security Administration (SSA), Dr. Kurtis emphasized that he had not seen claimant since 1987 and had no diagnosis consistent with chronic disability
 
 
 [4]
 In January 1988, Dr. Schiffman advised claimant that he had been unable to make a diagnosis of systemic tissue connective disease (arthritis) based on his laboratory tests and physical examination
 
 
 [5]
 Claimant also consulted an occupational therapist at the Communication Enhancement Clinic of the Children's Hospital in Boston, although he was not referred there by any health care providers identified in the record. Claimant sought computer components to eliminate the need for repetitive wrist motions
 
 
 [6]
 We note that following his hearing before the ALJ, claimant submitted a letter to the Appeals Council wherein he alleged that Dr. Ryan concluded that claimant has chronic pain syndrome and fibromyalgia, a condition discussed infra. However, Dr. Ryan's records are not before us
 
 
 [7]
 Fibromyalgia is pain in the fibrous tissues, muscles, tendons, ligaments, and other white connective tissues, frequently affecting the low back, neck, shoulders and thighs. See The Merck Manual (16th ed. 1992), pp. 1369-70. As Dr. Brummer's report suggests, the term fibromyalgia is often used interchangeably with fibromyositis, or fibrositis. See Lisa v. Dept. of Health and Human Services, 940 F.2d 40, 43 (2nd Cir. 1991). This condition has only been recognized over the last several years. It causes severe musculoskeletal pain, stiffness and fatigue due to sleep disturbances, although physical examinations will generally be normal. See Preston v. Secretary of Health and Human Services, 854 F.2d 815, 818 (6th Cir. 1988). The disease cannot be confirmed by objective tests, rather, the diagnosis is made by exclusion and the elicitation of tenderness at certain " 'focal tender points.' " Id. Fibrositis patients may also have psychological disorders; the disease afflicts women significantly more often than men. Id
 
 
 [8]
 It appears that the MRC simply assisted claimant in securing computer software and components that would allow him to pursue employment without exacerbating his condition
 
 
 [9]
 Dr. Robinson also noted that claimant might have an early form of scleroderma, a disease that would not account for claimant's symptoms
 
 
 [10]
 Dr. Bloomberg also observed that claimant's alleged incapacity was not objectively observable and that claimant presented as "vigorous, full of energy, walking and sitting down and rising ... with no difficulty apparent."
 
 
 [11]
 Claimant had been accepted to graduate school and expected to attend classes for two, eight-hour days per week at the time of the hearing