**Susan B. GREEN, Plaintiff,**

v.

**The PRUDENTIAL INSURANCE COMPANY OF AMERICA, et. al., Defendant.**

**No. 3:04–0078.**

United States District Court, M.D. Tennessee, Nashville Division.

April 22, 2005.

Eric L. Buchanan, Robert Scott Wilson, Eric Buchanan & Associates, PLLC., Chattanooga, TN, for Plaintiff.

G. Brian Jackson, David L. Johnson, Miller & Martin, LLP., Jeannine Huber, King & Ballow, Nashville, TN, for Defendants.

### *ORDER AND MEMORANDUM*

JOHN T. NIXON, Senior District Judge.

Pending before the Court is Plaintiff's Motion for Judgment on the Pleadings (Doc. No. 16), filed with an accompanying brief (Doc. No. 22), to which Defendant has responded (Doc. No. 31). Also pending before the Court is Defendant's Motion for Judgment on the Record (Doc. No. 18), filed with an accompanying memorandum of law (Doc. No. 19), to which Plaintiff has responded (Doc. No. 30). The parties also filed supplemental briefs pursuant to a Court order (Doc. Nos.40, 41) and the Court heard oral arguments on the dispositive motions on December 6, 2004. For the reasons stated below, Plaintiff's Motion for Judgment on the Pleadings is GRANTED in part; Defendant's Motion for Judgment on the Administrative Record is DENIED; and this matter is REMANDED to Prudential for further proceedings consistent with this opinion.

## I BACKGROUND

This action arises under the provisions of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et. seq.* ("ERISA"). Plaintiff Susan Green ("Green") was employed by Farmers and Merchants Bank ("Merchants") from February 1996 through August 31, 2000. Green was a participant under Merchants Bank Long Term Disability Plan group policy DG–78484 ("plan") underwritten by Defendant Prudential Insurance Company of America ("Prudential") and issued through Merchants. Prudential also served as the plan administrator. The plan permitted participating employees to obtain long term disability benefits ("LTD benefits").

Green was employed by Merchants as a "Commercial/Consumer Lender–Vice President" at its Clarksville, Tennessee branch. This position was largely sedentary in nature.[1] Green completed high school and two years of additional education in banking. Green voluntarily left her position on August 31, 2000 due to a medical condition. At the end of her employment, Green was thirty-seven years old. In an employee statement in the application for LTD benefits, she indicated that the nature of her illness was "chronic fibromyalgia[2] and depression" (AR 270).

Green applied for LTD benefits under the plan and was denied by Prudential. After Green exhausted her administrative appeals with Prudential, Green filed her complaint in federal court against Prudential and Merchants to obtain judicial review of the denial of LTD benefits (Doc. No. 1). The parties stipulated to the dismissal of Defendant Merchants, and the lawsuit now proceeds only against Prudential (Doc. Nos.14, 15). Green's cause of action is brought pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), to recover benefits she claims are due to her under the terms of the plan.[3]

Both parties seek judgment as a matter of law on the administrative record. Green moves the Court to apply a *de novo* standard of review and argues that the Defendant acted erroneously and arbitrarily in finding that she did not suffer from a disability as defined by the plan and denying her LTD benefits. Plaintiff asks the Court to reverse Prudential's decision and to order payment of benefits under the plan. The Defendant claims that there is no basis for a reversal of the decision

---

1. The administrative record contains little evidence as to Green's specific job duties. In Prudential's telephone call log, there is a January 3, 2001 entry written by Prudential employee Celeste Kolodin based on a conversation with "Lynn" in Merchants human resources department. The entry reads: "jd [job description]no written jd [job description]. Ee [employee] was branch mngr [manager] & lending officer, mostly sitting, can get up periodically, minor lifting, not an essential job function." AR 84.

2. Fibromyalgia indicates pain in fibrous tissues, muscles, tendons, ligaments, and other sites. *The Merck Manual of Diagnosis and Therapy*, Sec. 5, Chap. 59; *see also* AR at 118, 132 (citing studies), 133. Fibromyalgia can be characterized as a widespread chronic pain syndrome lasting at least three months with the presence of tenderness upon palpation at eleven of eighteen established areas of the body. *See* Wolfe MB, et al., *The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia, Report of the Multicenter Criteria Committee*, 33 Arthritis and Rheumatism 160, 161 (1990). Under the American College of Rheumatology criteria ("ACR criteria"), widespread pain is defined as pain in the left and right sides of the body, as well as above and below the waist. *See id.* Axial skeletal pain, defined as pain in the cervical spine, anterior chest, thoracic spine, or low back, must also be present. *See id.*

3. Green's second cause of action under ERISA § 502(c), 29 U.S.C. § 1132(c), for failure to provide plan documents was dismissed in earlier proceedings. (Doc. Nos.14, 15).

rendered by Prudential and asks the Court to affirm Prudential's determination that Green is not entitled to benefits under the plan.

### Plaintiff's Medical History

The medical records Prudential used to determine Green's eligibility for LTD benefits included reports from several physicians. Dr. Michael Lewis ("Lewis"), Green's primary care physician, treated Green from 1999 through 2002. Lewis' records indicate that Green complained of numbness, weakness, fatigue (AR 219); exhaustion, mood swings, decreased concentration and memory (AR 221); difficulty sleeping, concentrating, and thinking, and severe pain (AR 209–12). Lewis' progress notes dating from February 4, 1999 to November 29, 2000 indicate the following objective observations: that Green was "melodramatic and does not appear depressed"; "diffusely tender sinuses, back, thorax, arms, bilateral legs proximally and distally, and chest walls"; "histrionic and tearful"; "appears to be hyperventilating"; and "rambling" (AR 208–13). Over the same period, Lewis' progress notes also indicate a variety of assessments, including sinusitis, hypertension, change in mental status (uncertain etiology), weight gain (uncertain etiology), numbness of lower extremities (bilateral), fatigue, facial tingling, parethesias, suspect conversion disorder, major depression, fibromyalgia, and achalasia. (AR 214–23.) On one occasion, Lewis' assessment was as follows: "Depression, ? Bipolar disorder. I believe she has more going on than depression" (AR 223). The last assessment in Lewis' progress notes is "fibromyalgia, depression, achalasia, and hypertension, stable" (AR 224).

During his treatment of Green, Lewis referred Green to two neurologists, a rheumatologist, an additional primary care physician, a cardiologist, and a psychiatrist. (Doc. No. 22 at 6.) Dr. Uskavitch ("Uskavitch"), a neurologist, conducted a neurological evaluation. The evaluation did not result in a finding of any other abnormalities indicating demyelinating disease such as multiple sclerosis or any other neurologic disorder. (AR 246.) Uskavitch's April 12, 2000 neurologic consultation lists "sensory and other symptoms of uncertain cause" as his medical impression. (Doc. No. 234.) Uskavitch's May 1, 2000 letter to Lewis indicates that Green "remains a diagnostic enigma," noting "her symptoms are somewhat better, but she continues to have fatigue with variable sensory symptoms and discomfort in the legs." (AR 233.) Uskavitch then suggests further studies. (Id.) Uskavitch's August 16, 2000 report to Lewis also indicates that Green had obtained a second opinion and further neurological testing with Dr. Hoos ("Hoos"), another neurologist, which was normal, and that "her problem may be fundamentally fibromyalgia." (AR 227.)

There is a letter dated July 19, 2000 in the administrative record from Hoos to Lewis. In that letter, Hoos opines that Green's symptoms do not "strongly suggest demyelinating disease" and that they do suggest a "post-viral immunologically mediated neuropathy, with a more prominent emotional over reaction." (AR 230.) He noted that multiple sclerosis was "highly unlikely." (AR 230.)

On September 9, 2000, Green had an initial consultation with Dr. Hart ("Hart"), a psychiatrist. Hart's notes are very limited but do indicate "mildy depressed but full range of affect." (AR 252A.) Hart continued Green's medications and prescribed talk therapy with Ms. Beth Barnard ("Barnard"). Green did not follow up with Hart, but continued therapy with Barnard. (Id.) While there are no medical records from Barnard, the administrative record contains a Prudential telephone call

log with notes from a conversation between Prudential employee Celeste Kolodine ("Kolodine") and Barnard. The entry notes, "Asked Beth did she feel ee [employee] was psychiatrically impaired? Beth feels disability is more physical symptom, but there is intertwining w/ physical symptoms of stress." (AR 186.)

The medical records of Dr. Robert LaGrone ("LaGrone"), a rheumatologist, indicated there were various tender points found on examination of Green and LaGrone offered a diagnosis of fibromyalgia. (AR 237.) In a September 20, 2000 evaluation, LaGrone recommended various medications and also made reference to an assessment of osteoarthritis of the lumbar spine. (AR 237.) LaGrone noted Green "has had fibromyalgia for many years, initially with growing pains as a child." (*Id.*) In a November 15, 2000 evaluation, LaGrone noted that Green still expressed pain and tender points, adjusted her medications, noted "[Green] is clearly better," and turned management over to Hart. (AR 226.)

Green was also referred by Lewis to Dr. Robert Wheatley ("Wheatley"), a cardiologist. On Green's first visit, Wheatley's assessment and plan indicated that Green has "diffuse numbness and chest pain" and that her "symptoms are difficult to pinpoint as to the exact etiology," and prescribed further testing. (AR 231–32.) An August 24, 2000 follow-up letter from Wheatley to Lewis indicated that Green has multiple cardiac risk factors and presented the results of the cardiac evaluation, which were normal. (AR 228.) Wheatley anticipated no further cardiac work. (*Id.*)

The medical records show that Lewis also referred Green to Dr. David Sparks ("Sparks"), an additional primary care physician and Lewis' colleague, approximately one year after she was referred to the above specialists. Sparks' progress notes from August 15, 2001 through October 19, 2001 indicate that his objective observations were, among other things: tender trigger points, but a nontender chest wall; crying; and knots in the trigger points of Green's muscles (AR 206–8). Fibromyalgia was his only assessment over that period over time. (*Id.*) Sparks also completed a "Medical Source Statement to do Work–Related Activities (Physical)," in which he noted that lifting and carrying, standing and walking, and sitting are all affected by Green's impairment. He noted that in an eight-hour workday she can stand or walk one to two hours total, and zero hours without interruption; and sit two to three hours total, and zero hours without interruption.[4] Further, he noted Green's "muscles hurt and become stiff. This disorder causes the patient to need to change positions frequently" (AR 276–78). In conclusion, Sparks wrote: "Fibromyalgia causes severe pain and muscle weakness. This is generalized and difficult if not impossible to predict. This disorder makes it impossible to maintain gainful employment." (AR 278.)

Sparks' assessments are also discernable from letters he wrote supporting Green's claim for LTD benefits. In a September 10, 2001 letter to Prudential, Sparks wrote that Green "has fibromyalgia syndrome" which "began many years ago and has gradually worsened." Sparks indicates that "the fibromyalgia causes significant physical discomfort and fatigue with minimal activity" and "she is unable to be gainfully employed in any field." (AR 77.)

---

4. In a letter dated September 16, 2002 to Mr. Phillip Kendick, Green's counsel, Green clarified his answers on this form. He indicated that his answer to the questions regarding how many hours the patient can stand/walk or sit without interruption was zero (0) and should have been "less than one hour" or "minutes in time" (AR 133).

In a February 13, 2002 letter to Prudential, Sparks wrote that Green is "totally disabled from gaining any meaningful employment" (AR 132). In that letter, he states that fibromyalgia "has been known to not be related to psychiatric problems for at least [as long as 1990]." (AR 132.) In a September 16, 2002 letter to Green's counsel, Sparks wrote that Green has all eighteen tender points and that "because of these tender points and the pain, fatigue, and weakness that she experiences ... it is impossible for her to work." (AR 133.) Sparks further opined that as a result of fibromyalgia, Green "will be unable to maintain gainful employment in any field." (*Id.*)

### Claims History with Prudential

Green applied for LTD benefits under the Prudential plan on November 3, 2000, claiming she became disabled on August 30, 2000 as a result of chronic fibromyalgia and depression. Prudential denied Green's application and three appeals for LTD benefits, finding she did not suffer from a "total disability" as defined by the plan. Under the Prudential plan:

"Total Disability" exists when Prudential determines that all of these conditions are met:

(1) Due to Sickness or accidental injury, both of these are true:

(a) You are not able to perform, for wage or profit, the material and substantial duties of your occupation.

(b) After the Initial Duration of a period of Total Disability, you are not able to perform for wage or profit the material and substantial duties of any job for which are you are reasonably fitted by your education, training or experience.

(2) You are not working at any job for wage or profit.

(3) You are under the care of a doctor.

(AR 22.) Further, under the terms of the plan, if a disability is "caused at least in part by a mental, psychoneurotic or personality disorder," LTD benefits are limited to two years. (AR 25.)

After filing her claim, Green was informed by letter dated January 23, 2001 that "while the medical documentation indicates an increase in symptomology of fibromyalgia and depression at the time [Green] went out of work, [the symptoms have] resolved with medication and treatment." (AR 51). Prudential stated that "medical documentation does not indicate that [her] fibromylagia causes an impairment which would prevent [her] from working," and that her records revealed that she "had similar complaints in the past that have not prevented [her] from working." (AR 50–51.) As evidence, Prudential pointed to the records of LaGrone who indicated that Green "had fibromyalgia for many years, 'initially with growing pains as a child,'" and that after changing medications, "[LaGrone] notes that you are clearly better." (AR 50). Prudential stated that "while you may continue to experience fibromyalgia symptoms which may require treatment, the medical documentation does not indicate that your fibromyalgia causes an impairment that would prevent you from working." (*Id.*).

Prudential further made reference to Green's medical records from Lewis and Hart as to whether there was a psychiatric impairment. Prudential stated that "while [Green] may have symptoms which could benefit from continued therapeutic treatment, medical documentation does not show a significant psychiatric impairment which would prevent [her] from performing the material and substantial duties of [her] own occupation." (*Id.*) Prudential stated as a matter of assistance that they

would pay Green's benefits through January 31, 2001 and assist her with job placement.

Green submitted an administrative appeal of Prudential's determination on February 9, 2001. The appeal included a lengthy letter written by Green describing her daily symptoms and day-to-day life, as well as a letter dated February 5, 2001 from Lewis indicating the following:

> Ms. Green is no longer able to perform her duties as a financial manager and bank executive for Farmers and Merchants Bank because of her physical problems. She has made improvement with her depression and is able to better tolerate her fibromyalgia, but at this point, in my medical opinion, she is not able to perform the duties of such profession. The fibromyalgia physically exhausts her and causes significant physical discomfort to disable her from competently dealing with intricate financial matters. In addition, the depression magnifies the fibromyalgia, impairs her concentration, and makes it difficult if not impossible to perform complex multiple tasks which is required of her occupation and training. These problems make it difficult to assess her physical abilities and improvement because there are no objective medical or laboratory tests which can quantitate improvement or impairment. It is my opinion ... [that Green] remains disabled from substantial performance of any job for which she is reasonably trained and educated.

(AR 57.)

Prudential upheld its decision in a letter dated March 23, 2001. (AR 74.) Prudential's letter acknowledged receipt of Lewis' letter, and made reference to Uskavitch's findings that Green's MRI's and other tests and studies were normal and her "problem may be fibromyalgia." (AR 75). Prudential then stated that while Green's "physicians have diagnosed fibromyalgia, this diagnosis in and of itself is not indicative of a totally disabling condition[,]" that Green's medical records "do not document significant abnormalities on physical that would support an inability to perform [Green's] occupation[,]" and repeated that "Dr. LaGrone's records indicate improvement in [Green's] symptoms." (*Id.*) With regard to depression, Prudential reasserted its position that the file documentation indicated that Green's symptoms were improved by November 2000 and did not support a mental impairment.

Green appealed the denial of benefits a second time on October 29, 2001. With her appeal, Green included two letters from Sparks stating Green's fibromyalgia "began many years ago and gradually worsened" and she has "lost her ability to maintain gainful employment." (*Id.*) Further, Sparks stated that:

> [t]he fibromyalgia causes significant physical discomfort and fatigue with minimal activity. There are no objective medical or laboratory findings to help quantify this syndrome. Therefore, its severity and treatment are left to the judgment of the physician in charge. It is my medical opinion, that she is unable to be gainfully employed in any field. The length of her disability remains "unknown at this time." Sparks' additional letter further disputed Prudential's determination that fibromyalgia is "in and of itself not indicative of a totally disabling condition."

(Doc. No. 19 at 6.)

In reviewing this appeal, Prudential sent Green's medical records to a consulting physician, Dr. Kneapler ("Kneapler"), who is board-certified physician in Internal Medicine and Rheumatology, and a specialist in Internal and Occupational Medicine, Neuromuscoskeletal Disorders and Chronic Pain. Kneapler reviewed Green's

records but did not treat or examine her. Kneapler issued Prudential a letter with his observations and findings based on his review. Kneapler first indicates in this letter that his "mandate is to determine whether [Green] has any medical, rather than emotional, disability." (AR 86.) Kneapler systematically reviewed Green's medical records and made conclusions. With respect to fibromyalgia, he opined:

the moniker of FMS [fibromyalgia syndrome] as a physical explanation for her somatic complaints does not withstand scientific scrutiny, as no physical explanation has been found to confirm that FMS, a chronic pain syndrome of chronic widespread pain associated with tender points but no objective findings, and frequently accompanied by a host of somatic and emotional complaints not validated by objective testing, represents an actual physical illness or a source of physical disability.

(Doc. No. 19 at 6.) Kneapler ultimately found that Green's physical complaints were manifestations of her psychiatric difficulties, rather than the reverse. He noted, "features of her psychiatric condition preceded, or occurred at the same time, as her somatic complaints" and that her "physical complaints ... do not have a physical origin." (AR 92.) Kneapler concluded that Green did not suffer from any labor-limiting physical disability that would prevent her from performing her job and that she did not suffer from a "total disability." (Doc. No. 19 at 6–7.)

Kneapler also recommended a psychiatric evaluation for "further clarification of the true nature of her condition" and to determine whether Green would be eligible for the two years of disability benefits Prudential provides when disabilities are caused at least in part by a mental, psychoneurotic, or personality disorder. (AR 92.) He notes that "only a psychiatrist with sufficient expertise in these conditions should, for medicolegal purposes, document as to whether her psychiatric disability satisfied the requirements for the up to two years of temporary psychiatric disability allowed." (Id.)

In a letter dated January 23, 2002, Prudential informed Green that it upheld its initial decision determining Green did not suffer from a "total disability." In this letter, Prudential made reference to the following findings by Kneapler: (1) that "one cannot consider Ms. Green's depression as occurring from a chronic medical illness as features of her psychiatric condition preceded, or occurred at the same time, as her somatic complaints;" (2) that "the diagnosis of fibromyalgia as a physical explanation for her somatic complaints does not withstand scientific scrutiny as no physical explanation has been found to confirm that FMS, represents an actual physical illness or a source of physical disability"; and (3) that Kneapler cannot support any "labor-limiting permanent physical disability." Prudential concluded that "based on the results of our review of the documentation on file referenced in previous letters, as well as Kneapler's evaluation," the medical evidence did not support a finding of disability based on either a mental or physical impairment.

Green appealed a final time. She submitted letters to Prudential from Sparks that noted significant disagreement with Kneapler's opinions on fibromyalgia. Green also included with her appeal a copy of a November 4, 2002 decision rendered by the Social Security Administration ("SSA") finding that Green was disabled and entitled to social security benefits. The Social Security Administrative Law Judge ("ALJ") in her SSA case noted that fibromyalgia is "rather ephemeral in nature and difficult to pinpoint" and that there is no "substantive diagnostic test ... to determine its existence." (AR 125.) The ALJ stated, "[t]he record indicates

that the claimant does engage in a variety of activities of daily living" and Green's case is "made more difficult by the fact the claimant has been noted to be rather dramatic and histrionic in her presentation, with some physicians questioning whether her complaints are somatic in nature." (*Id.*) The ALJ ultimately decided that Green was entitled to a period of disability and disability benefits based on "most importantly" the finding of disability from Green's treating physicians, Lewis and Sparks. (*Id.*) The ALJ also found that Green's "medical record is not impressive, with regard to the severity of the claimant's condition and alleged symptoms." (*Id.*)

In reviewing this appeal, Prudential retained another physician, Dr. Brachman ("Brachman"), a specialist in Internal Medicine, Rheumatology, and Occupational Medicine. Brachman conducted a review of Green's medical records and noted that there was no evidence upon physical examination that Green has joint synovitis, deformity, decreased range of motion (other than from pain), decrease in muscle strength, function, or any focal neurologic abnormality, and that the only evidence of fibromyalgia is the diffuse tender points. Brachman noted that Green "qualifies for the classification of fibromyalgia by the presence of multiple diffuse tender points on exam." (AR 117). She explained that "fibromyalgia is not considered a disease" and discussed the relationship between psychological disorders and fibromyalgia. Brachman noted that for approximately 20% of fibromyalgia patients a formal diagnosis of somatization can be made and 90% of fibromyalgia patients have a "lifetime prevalence" of one or more psychiatric disorders. Brachman suggested that the medical studies indicate it is difficult to determine causal relationships, but many suggest that a pre-existent psychiatric disorder pre-disposes to the later development of fibromyalgia.

Brachman found that (1) there was no information regarding the treatment of achalasia in the records, but, regardless, achalasia (except for postoperative recuperation) does not cause a physical impairment that would prevent an individual from performing the essential functions of a sedentary job; (2) Green has had a psychiatric disorder at least since May 19, 2000 and while the diagnosis given was major depression, other possible diagnoses include a conversion disorder, somatization disorder and dependent personality disorder; and (3) Green is not physically impaired from performing the essential functions of her own occupation or most sedentary jobs because of symptoms of fibromyalgia. (AR 119.) Brachman also suggested some reasonable accommodations for Green. Brachman concluded that Green "may have been (and continue to be) impaired from performing the essential functions of her own or another sedentary job because of symptoms relating to her Major Depressive Disorder," but not "because of symptoms of fibromyalgia." (*Id.*) Brachman recommended evaluation by an expert in psychiatric disorders to assess whether Green has had a mental/nervous impairment. (*Id.*)

By way of letter dated March 3, 2002, Prudential denied Green's final appeal, again determining that the medical evidence did not support a finding of total disability caused by either a mental or physical impairment. Prudential referenced Brachman's findings, "highlighting Brachman's opinion that Green may be disabled as a result of Major Depressive Disorder," but that "there is no evidence of functional deficits that would prevent [Green] from engaging in her occupation." (AR 136.) Prudential also made specific mention of Brachman's following findings: (1) that Green had reported diffuse pain since childhood and had a "long history of depression," but while there was no evi-

dence to support a worsening of her musculoskeletal or neurologic status before she ceased work, there was evidence of a worsening of her psychiatric condition; (2) Major Depressive Disorder was the cause of her mental and physical symptoms; and (3) reasonable work restrictions for Green include no prolonged standing or walking and the ability to frequently change positions to maintain her comfort. At the same time, Prudential stated that it was not able to "adequately evaluate Green's eligibility for benefits due to psychiatric reasons" because it did not have adequate evidence of Green's psychiatric treatment. Prudential invited Green to submit additional documentation related to her psychiatric symptoms for further review. (*Id.* at 137–38.) After this final denial, Green filed the instant action.

## II  STANDARD OF REVIEW

■ "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine the eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The Sixth Circuit has interpreted *Bruch* to mean that, "[w]hile 'magic words' are unnecessary to vest discretion in the plan administrator and trigger the arbitrary and capricious standard of review, this circuit has consistently required that a plan contain 'a *clear* grant of discretion' [to the administrator] to determine benefits or interpret the plan." *Perez v. Aetna Life Ins. Co.* 150 F.3d 550, 555 (6th Cir.1998) (citations omitted). In interpreting ERISA plan language, federal courts apply federal common law rules of contract interpretation, taking direction from both state law and general contract law principles. *Id.* at 556. These principles dictate that we interpret the plan's provisions according to their plain meaning. *Id.*

In this circuit, a variety of plan language has been held to grant discretion to ERISA plan administrators. *See Williams v. Int'l Paper Co.,* 227 F.3d 706, 711 (6th Cir.2000) (finding that "the Plan clearly gives the Plan Administrator authority to determine eligibility for disability benefits inasmuch as the Plan Administrator must 'find that the Disability is likely to be permanent during the remainder of the Participant's life' "); *Univ. Hospitals of Cleveland v. Emerson Elec. Co.,* 202 F.3d 839, 846 (6th Cir.2000) (finding an express grant of discretion because the "Plan in this case provides that the EBC 'shall have the discretionary authority to determine eligibility for benefits or to construe the terms of the Plan' "); *but see Williams v. Cont'l Casualty Co.,* 138 F.Supp.2d 998, 1009–10 (holding the phrases "written proof of loss" and "immediately after [CNA] receive[s] due written proof of loss" do not vest discretion in the plan administrator).

■ Arguing that the plan contains the requisite clear grant of discretion to the plan administrator, Prudential points to the following plan language: " 'Total Disability' exists *when Prudential determines* that all of these conditions are met ..." (emphasis added). The exact language at issue in this plan has been found to be sufficient to grant discretionary authority to the plan, thus invoking the arbitrary and capricious standard. *See Sparkman v. ATC Healthcare Servs., Inc.'s Long Term Disability Benefit Plan,* No. 3:01–0266 (M.D.Tenn.2002) (Campbell, J.) (holding the statements "when Prudential determines" and "as determined by Prudential" sufficient). Further, another federal district court has held that the language "as Prudential determines," coupled with a plan requirement that proof for benefits

meet specific requirements as subjectively determined by Prudential, was sufficient to put the claimant on notice of Prudential's discretionary authority. *See Diaz v. Prudential Ins. Co. of America*, 2004 WL 1094441 (N.D.Ill.2004).

Both the plain meaning of the plan and the reasoned analysis of the other district courts lead to the conclusion that the language "as Prudential determines" clearly grants discretion to the plan administrator. Therefore, the arbitrary and capricious standard applies here.

■ Under the highly deferential arbitrary and capricious standard, "[when] it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir.1997) (citations omitted). But in determining whether an administrator acted arbitrarily and capriciously, the district court has an obligation that "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald v. Western–Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir.2003).

Notwithstanding this deferential standard of review, courts must be aware of possible conflicts of interest and consider them as a factors when determining whether the decision to deny benefits was arbitrary and capricious. *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 527 (6th Cir.2003) (citations omitted); *see also Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1069 (6th Cir.1998) (noting that " 'the abuse of discretion or arbitrary and capricious standard still applies, but application of the standard should be shaped by the circumstances of the inherent conflict of interest' ") (*quoting Miller v. Metropolitan Life Ins.*, 925 F.2d 979, 984 (6th Cir.1991)).

■ Green argues that there is a conflict of interest due to the fact that Pru-dential both decides the claims and pays the benefits. This circuit has recognized that where a claims administrator "both funds and administers the plan ... it incurs a direct expense as a result of the allowance of benefits, and it benefits directly from the denial or discontinuation of benefits." *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 521 (6th Cir.1998) (citations omitted). As the *Darland* court noted, experts "have a clear incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements." 317 F.3d at 528. Since such a conflict exists in the existing action, the court weighs Prudential's conflict of interest as one factor when determining whether Prudential's decision was arbitrary and capricious.

## III DEFENDANT'S MOTION FOR JUDGMENT ON THE RECORD

■ Prudential asserts that there is no basis for reversal and requests that the Court affirm Prudential's decision. Prudential argues that it acted within its discretion and "primarily relied on the medical records and evaluations of the plaintiff's own treating health care providers and the opinions of consulting experts." (Doc. No. 19 at 15.) In its response to Plaintiff's Motion for Judgment on the Pleadings, the Defendant also argued that, even if Green were to show that Prudential unreasonably adjudicated her claim for LTD benefits, Green is limited to two years of LTD benefits based on the plan's provision that limits benefits to two years where the disability is caused at least in part by a mental, psychoneurotic, or personality disorder.

Prudential's reasons for denying Green's claim, as delineated by Prudential in the denial letters discussed above, amount to the following: (1) the medical documenta-

tion indicated that Green had similar complaints in the past that did not keep her from working; (2) the medical documentation indicated that Green's symptoms had improved by November 2000; (3) file reviewers Kneapler and Brachman opined that Green was not physically disabled and that Green's symptoms were most likely related to underlying psychological disorders; and (4) there was not substantial evidence in the record of a mental or physical impairment rising to the level of total disability.

First, the Court views with skepticism Prudential's argument that Green had similar complaints in the past. While it may be true as a factual matter that Green had similar complaints, this does not lead to the conclusion that Green can work. Rejecting such an argument as a "bad argument"—also in the context of a fibromyalgia case—the Seventh Circuit Court of Appeals recently stated, "[t]his would be correct were there a logical incompatibility between working full time and being disabled from working full time, but there is not. A desperate person might force himself to work despite an illness that everyone agreed was totally disabling." *Hawkins v. First Union Corp. Long–Term Disability Plan*, 326 F.3d 914, 918 (7th Cir.2003). The Court thus finds that denying LTD benefits based on the mere fact that Green had similar complaints in the past is unreasonable.

Second, and relatedly, even if Green's symptoms had improved, this does not mean that Green was able to work. Prudential points out that LaGrone stated in 2000 that Green's symptoms had improved. The records indeed reflects that LaGrone's noted, "[Green] is clearly better." Even so, Prudential's argument fails because even though LaGrone expressed that there was improvement, LaGrone never made any recommendation as to Green's ability to perform the material and substantial duties of her occupation or any occupation for which she is reasonably fitted. As such, it not reasonable to interpret LaGrone's statement about improvement to mean that Green did not suffer from a disability within the meaning of the plan.

Moreover, the Court finds that LaGrone's statement is ambiguous as to how and to what extent Green is "better." LaGrone also adjusted her medications and noted her continued pain during that same visit. In addition, LaGrone's notes from an office visit approximately three weeks earlier indicates, "Because this is a very chronic problem, *she may not get full recovery*, but I think she should begin to feel better." (AR 237) (emphasis added). Green's treating physicians opined both before and after LaGrone's statement about improved symptoms that Green was unable to function in her job. Moreover, Prudential's own file reviewer stated, "[a]lthough I appreciate the letter from the Appeals Unit indicating she had improved, that was not reflected in the records that I reviewed, nor is it my experience in such individuals." (AR 91). Finally, no other physician that examined Green was of the opinion that she had improved.

Prudential's third and fourth reasons also must fail for reasons discussed below.

## IV PLAINTIFF'S MOTION FOR THE JUDGMENT ON THE PLEADINGS

The Court will review each of Plaintiff's arguments supporting her motion below.

### *File Reviewers Opinion of Fibromyalgia*

■ Green first argues that Prudential's denial was arbitrary and capricious because it relied on the opinions of file reviewers who do not think fibromyalgia is a potentially disabling physical condition. Green points to Kneapler's statement that there is no evidence that fi-

bromyalgia "represents an actual physical illness or a source of physical disability" (AR 105, 136) and Brachman's finding that one-third of individuals with fibromyalgia report or receive disability, however whether an individual with fibromyalgia becomes "disabled" is "related to that individuals' underlying emotional/psychological status and coping mechanisms." (Doc. No. 19 at 10.) Green argues that while Brachman points to a correlation between suffering from fibromyalgia and being disabled, she does not conclude what causes an individual with fibromyalgia to become disabled, and did not do so with respect to Green.

While the record reflects a debate over the physical and mental aspects of fibromyalgia, fibromyalgia is, in fact, recognized as a potentially disabling condition. The Sixth Circuit has held that fibromyalgia can be disabling. *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir.1988) ("There is no doubt that [the Plaintiff] suffers from disability due to her fibrositis")[5]; *see also Green–Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir.2003) ("fibromyalgia is a disabling impairment"). The Social Security Administration also recognizes fibromyalgia as a "medically determinable impairment." *Social Security Ruling SSR–99–2p, available at* 1999 WL 271569.

With that said, the Court finds the file reviewers opinions on what causes fibromyalgia significant. The significance lies in the fact that under the Prudential plan, even if a claimant is found to be totally disabled, the plan limits benefits to two years for disabilities caused at least in part by a mental, psychoneurotic, or personality disorder. Therefore, Kneapler and Brachman's opinions on whether fibromyalgia is caused by a psychiatric disorder bears heavily on their ability to make a finding of total disability as defined by the plan that

would result in LTD benefits lasting more than two years. Kneapler was well aware of the limitation in Prudential's policy; in fact, he references it in his report. Brachman also issued separate findings on whether there was a physical disability and a mental disability, indicating that she was aware of the policy limitations.

Green and her doctors argue that fibromyalgia is a "physical disease," that "produces a variety of *physical* symptoms and difficulties" and is "not a mental disorder." (Doc. No. 40 at 12). Sparks, Green's physician, stated in a letter to Prudential that fibromyalgia "has been known to not be related to psychiatric problems for at least [since 1990]." (AR 132). Green also cites case law to support her contention that fibromyalgia is a physical disease. *See* Doc. No. 40 at 12 (*citing Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872–73 (9th Cir.2004) (citations omitted) ("Objective physical signs, laboratory results, and x-ray results are generally negative, and [b]ecause the majority of patients appear tense and anxious and have no recognizable objective basis for symptoms, the syndrome is often considered psychogenic. This Court, however, has recognized fibromyalgia as a physical rather than a mental disease."); *Green–Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir.2003); *Preston v. Secretary of Health & Human Servs.*, 854 F.2d 815, 819 (6th Cir.1988); *Swain v. Comm'r of Soc. Sec.*, 297 F.Supp.2d 986, 993 (N.D.Ohio 2003)). While each of these cases recognizes fibromyalgia's physical symptoms or recognizes the physical aspects of fibromyalgia, none details the cause of fibromyalgia.

Green also cites to the Merck Manual to support her assertions about the nature of fibromyalygia. The Court takes notice that, according to the Merck Manual:

**5.** Fibromyalgia was once commonly referred to as fibrositis.

Fibromyalgia may be generalized (sometimes associated with a concomitant condition) or localized (i.e., myofascial pain syndrome, often related to overuse or microtrauma). Primary fibromyalgia syndrome (PFS) is a generalized, idiopathic form that is likely to occur in healthy young or middle-aged women who tend to be stressed, tense, depressed, anxious, and striving, but may also occur in children or adolescents (particularly girls) or in older adults, often associated with unrelated minor changes of vertebral osteoarthritis.

.  .  .  .  .

PFS is recognized by the typical pattern of diffuse fibromyalgia and nonrheumatic symptoms (e.g., poor sleep, anxiety, fatigue, irritable bowel symptoms), by exclusion of significant contributory or underlying diseases (e.g., generalized osteoarthritis, RA, polymyositis, polymyalgia rheumatica, other connective tissue disease), and by exclusion of psychogenic muscle pain and spasm. Fibromyalgia associated with such disorders (i.e., concomitant or secondary fibromyalgia) manifests as musculoskeletal symptoms and signs similar to PFS (except for psychogenic rheumatism) but requires differentiation from PFS to allow identification and treatment of the concomitant or underlying disorder and the fibromyalgia itself. Occult rheumatic disease and hypothyroidism in a middle-aged female should be excluded. Nonspecific and mild histopathologic changes may be present in the muscles, but similar changes are also found in normal control subjects.

*Merck Manual of Diagnosis & Therapy,* Sec. 5, Chap. 59 (17th ed.2005). The Court further takes notice that other medical research on fibromyalgia since the American College of Rheumatology issued its criteria in 1990 indicates that the medical community has not "achieve[d] a full un-derstanding of pain in fibromyalgia," A. Bengtsson, Editorial, *The Muscle in Fibromyalgia,* 41 British Society for Rheumatology 721, 723 (2002), and that "the only certainty in fibromyalgia is that it is still being diagnosed." I. Hazemeijer & J.J. Rasker, *Fibromyalgia and the Therapeutic Domain: A Philosophical Study on the Origins of Fibromyalgia in a Specific Social Setting,* 42 British Society for Rheumatology 507, 507 (2002).

Kneapler states, "as having treated and/or evaluated many of these individuals with a syndrome characterized by chronic pain/dysfunction without objective findings to confirm their complaints, I have considerable experience with the emotional side of these disorders, which I detected as a pervasive theme in the available medical records." (AR 86). Kneapler indicates that "no physical explanation has been found to confirm that [fibromyalgia] . . . represents an actual physical illness or a source of physical disability." (AR 88). He also notes that "neurologists see their fair share of emotionally driven complaints, which very likely explains her fatigue and neurological complaints, as well as the many other complaints that evolved as part of her emotionally driven pain/dysfunction syndrome." (AR 88.)

Kneapler did not ultimately determine whether Green has fibromyalgia or any other condition. He did however conclude that she is not physically disabled, and suggested a psychiatric evaluation to clarify "the true nature of her condition." (*Id.*) In rendering this conclusion, Kneapler emphasized that Green's psychiatric symptoms preceded or occurred at the same time as her physical ones. (AR 102).

The Court views Kneapler's report with a high degree of skepticism. First, Kneapler reports that he "has considerable experience with the emotional side of these disorders" and his report reflects this.

For example, he speculates, "as active denial, frequently to the point of challenging anyone who suggests that complaints are anything but physical in origin, is frequently very vociferous in individuals with this psychosomatic pattern, possibly [Green's] treaters sensed this and did not challenge her." (AR 90). Second, Kneapler reached his conclusion without the benefit of reviewing results of an independent psychiatric examination that he recommended in order to understand the true nature of Green's illness. Finally, he rendered his conclusion that Green's psychiatric symptoms occurred before her physical symptoms despite evidence from both LaGrone's progress notes and letters from Sparks to Prudential to the contrary. The problems with Kneapler's report are especially suspect in light of Prudential's conflict of interest and incentive to hire file reviewers that would find claimants either not disabled or disabled by a mental disorder.

Prudential's second consultant, Brachman, indicates that fibromyalgia "is not a disease entity" and describes fibromyalgia as "merely a label for chronic diffuse pain with identifiable diffuse tender points." Brachman's analysis of fibromyalgia does not conclude that fibromyalgia is always caused by psychiatric disorders. She notes that many of the studies investigating the co-morbidity of fibromyalgia symptoms and psychiatric disorders "are cross-sectional making it difficult to determine causal relationships. Many of these studies, however, suggest that a pre-existent psychiatric disorder pre-disposed to the later development of fibromyalgia or other chronic pain syndromes [and] ... pre-existent depression is a significant risk factor for the future development of chronic muscoskeletal pain." (AR 118–19). However, she concludes that Green's chronic pain is a symptom of Green's psychiatric disorder because Green's previous pain was not disabling and there was evidence of a worsening of her psychiatric disorder before she ceased work. Brachman submits that Green's symptoms of "fatigue, diffuse pain, sleep disturbance and neurocognitive difficulties involving memory, concentration and attention," are symptoms of her underlying psychiatric disorder(s); and that Green "may have been (and may continue to be) impaired from performing the essential functions of her own or another sedentary job because of symptoms related to Major Depressive Disorder" but not "because of symptoms of fibromyalgia."

While Brachman's report appears more objective because she does not express a tendency to initially look at the emotional side of chronic pain syndromes, like Kneapler does, the Court still views Brachman's final conclusions with some skepticism. First, Brachman takes notice of the reports of longstanding fibromyalgia symptoms in Green's records, yet still opines that Green's fibromyalgia is derived from a psychiatric disorder. Second, she too rendered her conclusions without the benefit of reviewing the results of a psychiatric examination that she recommended And finally, despite the substantial occupational limitations Sparks laid out, and even though she never physically examined Green, Brachman delineated specific occupational accommodations that would allow Green to work. The basis for Brachman's specific accommodations is inexplicable.

The record in this case ultimately reflects conflicting opinions as to whether Green's symptoms are caused by or are simply correlated with a mental disorder. There is no doubt that Prudential relied on the opinions of consultants who tend to believe fibromyalgia, or chronic pain symptoms such as described by Green, may be caused by mental disorders—one indicates familiarity with the mental aspect of pain disorders and asserts that fibromyalgia is not a physical illness and one appears

heavily influenced by studies suggesting psychiatric disorders predispose individuals to fibromyalgia. However, considering the conflicting medical research in the record on the cause of fibromyalgia, it was not unreasonable for Prudential to use these file reviewers in coming to their conclusion, particularly due to the fact that they both coupled medical research with specific evidence in Green's medical records. While taking notice that Prudential was clearly under an incentive to engage consultants who endorsed the view that fibromyalgia is caused by or correlated with mental disorders in their decision-making process, the Court finds that it was not arbitrary and capricious for Prudential to do so considering the conflicting medical evidence on this point.

This is especially true considering the fact that even if Prudential utilized the reports of consulting physicians who do not recognize fibromyalgia as a physical illness or source of disability, *Prudential* did not ultimately dispute Green's fibromyalgia diagnosis or suggest that fibromyalgia could not be a physical illness. Prudential's initial denial letter of January 23, 2001, written before Brachman and Kneapler reviewed Green's file, indicated that "while you may have fibromylagia symptoms which may require medical treatment, the medical documentation does not indicate that *your fibromyalgia* causes an impairment *which would prevent you from working.*" (AR 50) (emphasis added). Prudential's denial letter dated March 23, 2001 recognizes that Green's physicians diagnosed her with fibromyalgia, but states "this diagnosis in and of itself is not indicative of a totally disabling condition." (AR 72.)

### Independent Medical Examination

Green next argues that the opinions of Kneapler and Brachman are "highly questionable" because they did not conduct an independent medical examination of Green. Green argues that this is particularly problematic because the doctors were operating under a conflict of interest.

Other circuits have strongly encouraged the use of independent medical examinations where there is a conflict of interest to best effectuate the purposes of ERISA. *See, e.g., Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997, 1015 (10th Cir.2004) (en banc); *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir.1998) ("When it is 'possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries.' ") (citation omitted). However, independent medical examinations are not required *per se.*

The record shows that fibromyalgia cannot be confirmed by medical or laboratory testing and that the diagnosis turns on subjective reports of pain. *See Preston v. Sec'y of Health & Human Serv s.*, 854 F.2d 815 (6th Cir.1988) ("Unlike most diseases that can be confirmed or diagnosed by objective medical tests, fibrositis can only be diagnosed by elimination of other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue."); *see also Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir.1996) ("There are no laboratory tests for the presence or severity of fibromyalgia"). There is no doubt that Green's reports of pain and records demonstrating the elimination of other diseases are in the record and Prudential did not dispute that Green experienced pain.

In this case, Brachman and Kneapler disputed the treating physicians' assessments of Green's capacity to do work-related activities without conducting a physical examination. There were no other opinions in the Green's medical records

pertaining to her ability to work. However, as a fibromyalgia diagnosis does not turn on objective testing, an independent physical examination may or may not have yielded any more information. As such, this Court cannot find that it was unreasonable to not conduct an independent physical medical examination. However, an such an examination would have been extremely useful to determine Green's occupational limitations, if any, and to add more credibility to the opinions of Kneapler and Brachman. A physical or occupational therapist, for example, could have served as an invaluable resource in determining Green's work-related capacities.

In this case, what is clear is that both of Prudential's hired experts recommended an independent psychiatric evaluation of Green to determine the nature of her condition or impairment and whether she suffered from a total disability. Kneapler and Brachman stated that they were unable to complete their role in determining whether Green is totally disabled without a psychiatric examination, yet without explanation, Prudential never engaged a psychiatrist to complete an examination. Based on these recommendations by their own consultants, and in light of a finding of disability by her two treating physicians and evidence of psychiatric impairment in the record, the Court finds it was unreasonable for Prudential to not require an independent psychiatric evaluation.

### Objective Evidence Requirement

◼ Third, Green argues that Prudential improperly required objective evidence to prove her disability even though this requirement is not in the plan. In support of this argument, Plaintiff points to Kneapler's observation that:

> Still, as Doctor Sparks noted, there were no objective medical findings, whereas her history indicated beyond a doubt her lengthy psychiatric difficulties and her difficulties coping at work. A dispas-

sionate medical observer, armed with this knowledge, and requiring objective confirmation of the nature, severity and extent of her physical complaints, could only reasonably conclude that her physical complaints were manifestations of her psychiatric difficulties rather than the reverse.

(Doc No. 22 at 16; AR 92). Green also references Kneapler's description of fibromyalgia in his report as "a chronic pain syndrome of chronic widespread pain associated with tender points but no objective findings, and frequently accompanied by a host of somatic and emotional complaints not validated by objective testing." Defendants argue that Green misconstrues the report and that, "Prudential's decision was not based simply on a lack of objective evidence but it was based on the determination by two physicians that the plaintiff's symptoms were not attributable to her fibromyalgia." (Doc. No. 31 at 3.)

In this case, where treating physicians and specialists have diagnosed fibromyalgia, and the medical research indicates that there are a lack of objective tests to prove this condition, it is unreasonable to require objective findings. *See, e.g., Preston v. Sec'y of Health & Human Servs.,* 854 F.2d 815, 819 (6th Cir.1988). Kneapler's references to the lack of objective findings, Prudential's reliance on his report, and Prudential's argument that its decision "was not based simply on a lack of objective evidence" seem to indicate that a lack of objective evidence at least partially informed Prudential's final decision. At the same time, Kneapler did not dispute Green's subjective accounts of pain; Prudential's letter acknowledges Green's reports of pain; and Prudential's March 2001 denial letter states, "While you may experience discomfort and symptoms that require further treatment, the medical documentation in file does not reveal evidence of a significant physical or mental impair-

ment based on documented medical evidence that would prevent you from performing the duties of your occupation as of February, 2001, while continuing with such treatment." (AR 72.) When considered in the totality, the Court finds that Prudential did not require objective evidence to diagnose Green with a total disability as defined by the plan. (AR 92.)

The Court also notes here that Prudential and Prudential's consultants seemed to have place great weight on the negative findings of the specialists. The denial letters and the consultants' reports systematically show how other medical explanations for Green's symptoms were rejected. To place great weight on these findings would be to misunderstood their significance. As discussed above, and as other courts have recognized, this type of systematic ruling out of other conditions has been found to be essential to a fibromyalgia diagnosis.

### Medical Evidence in the Record

■ Fourth, Green argues that Prudential ignored the evidence in Green's medical records, particularly Green's treating physicians' records, without providing an explanation. "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Even so, the Supreme Court recently held that courts cannot require plan administrators "automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Id. at 834, 123 S.Ct. 1965.

■ In this case, Prudential made reference to each of Green's doctor's observations and opinions in its denial letters.

Further, each of Prudential's consulting physicians reviewed Green's medical records and referenced each of physician's observations and findings. The Court therefore finds that Prudential at least observed all of the medical evidence in the records. However, the Court finds that Prudential arbitrarily refused to credit or attached little to no significance to this evidence, which the Court finds reliable.

In its denial letters, Prudential simply concluded and repeated that a review of the evidence did not support a finding of total disability based on either physical or mental impairment. In its decision as to physical disability, Prudential attached little to no significance to Lewis and Sparks' findings of total disability. It did not conclude that Lewis and Sparks were not credible, but rather referred to LaGrone's indication as to Green's improvement. The Court pointed out the inadequacies of such an argument above.

There was also a significant amount of evidence in Green's medical records and the reports of Kneapler and Brachman concerning a possible psychiatric impairment. Even the Defendant asserts that the record reflects Green's "long history of psychiatric difficulties." (Doc. No. 31). Yet, Prudential's denial letters indicate that it failed to attach weight to this evidence, which the Court finds reliable. The record further indicates that Prudential limited some of its review of Green's claim for LTD benefits to a claim based on a purely physical disability. For example, Kneapler indicated that it was his "mandate" to assess Green for "medical, rather than emotional, disability" (AR 86).

Ultimately, Prudential's letters make it rather unclear as to what it *did* rely on, considering it did not follow its own experts' advice regarding a psychiatric evaluation, it did not conduct an independent physical examination to assess work-relat-

ed capacity, it did not defer to Green's treating physicians, and it did not defer to Green's personal account of her limitations. Rather than credit the opinions of doctors that examined Green and which the Court finds reliable, Prudential instead relied on its own determination that this was not sufficient to prove total disability, without explanation. Prudential unreasonably discounted reliable evidence of Green's symptoms as reported by her physicians. Their denial letters merely repeatedly state that Green's condition does not meet the terms of the plan and offer negligible evidence from the record in support. The scant review of this evidence is indicative of the arbitrary nature of Prudential's determination.

### Social Security Decision

■■■ Finally, Green argues that Prudential did not properly analyze the decision of the Social Security Administration ("SSA") which found Green to be totally disabled and granted her disability benefits. Green suggests that the fact that Prudential did not provide any reason for rejecting the SSA decision underscores the arbitrary nature of Prudential's decision making.

While other courts have found that it is proper for administrators to use Social Security decisions in determining benefits, Prudential had no obligation to adopt the Social Security Administration's decision. Plaintiff points to *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516 (6th Cir.2003), for the proposition that a favorable SSA decision should not be ignored. However, *Darland* must be understood in context. In that case, the plaintiff was encouraged to apply for social security benefits by her insurer. Relying on the principles of judicial estoppel, the court held that "it is totally inconsistent for [the defendant] to request that [the plaintiff] apply for Social Security disability benefits, yet avail itself of that Social Security determination re-

garding disability to contend, at the same time, that [the plaintiff] is not disabled." *Id.* at 530. Moreover, in that case, the court found that the "Social Security standard for a disability determination is much more stringent" than the Defendant insurance company's criteria. *Id.* Plaintiff also mistakenly relies on *Juan De Dios Cortes v. MetLife, Inc.* 122 F.Supp.2d. 121, 130 (D.P.R.2000), where the court held that the insurance company had erred in failing to consider an award of SSA benefits. However, the decision turned on the fact that the plan at issue "itself defines Total Disability in part by reference to an award of benefits by the Social Security Administration, thus rendering this evidence particularly relevant to the administrator's determination." *Id.* at 130–31.

In this case, Prudential acknowledged that it was aware of the favorable SSA in the March 3, 2003 letter denying Green's final appeal. (AR 137.) Prudential further explained the difference in decisions, by noting that the SSA uses different criteria than the Prudential plan and that "Prudential must evaluate claims based on terms of the Group Policy independent of the Social Security Administration."

The Court notes that Green's SSA decision could have actually weighed against granting Green LTD benefits. The ALJ stated that the "medical record is not impressive" with respect to the severity of Green's symptoms. The ALJ also applied great deference to Green's treating physicians. The Court repeats that the "treating physician rule" is applicable in the social security context, but was specifically rejected by the Supreme Court for ERISA cases. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Accordingly, the Court finds that Prudential reasonably reviewed the SSA decision.

## V CONCLUSION

In this case, the arbitrary and capricious standard applies, although the Court considers Prudential's conflict of interest as one factor in its review. Under this standard of review, the Court finds that Prudential arbitrarily and capriciously denied LTD benefits and did not provide a reasoned explanation, based on the evidence, for denying benefits under the plan's provisions. The Court concludes that the appropriate remedy at this juncture is to remand the claim to Prudential for a new determination.

Based on the foregoing,

(1) Plaintiff's Motion for Judgment on the Pleadings is GRANTED in part;

(2) Defendant's Motion for Judgment on the Administrative Record is DENIED;

(3) Prudential's determination is REVERSED and the cause is REMANDED to Prudential for a further proceedings, to include updating the medical record and issuance of a new determination of whether Green suffers from a "total disability" under the terms of the plan, and if so, whether this disability is caused at least in part from a mental, psychoneurotic, or personality disorder.

(4) The Clerk of the Court is ORDERED TO ADMINISTRATIVELY CLOSE this cause pending a new determination by Prudential with room for either party to re-open.

It is so ORDERED.